UNITED STATES, Appellant,

v.

Walter S. STEVENSON, Hospital
Corpsman Third Class, U.S.
Navy, Appellee.

No. 00–6001.
Crim.App. No. 99–0769.

U.S. Court of Appeals for
the Armed Forces.

Argued May 2, 2000.

Decided Aug. 2, 2000.

EFFRON, J., delivered the opinion of the
Court, in which CRAWFORD, C.J., SULLI-
VAN and GIERKE, JJ., and COX, S.J.,
joined.

For Appellant: *Lieutenant Timothy E.
Curley*, JAG, USNR (argued); *Colonel Kev-
in M. Sandkuhler,* USMC, and *Commander
Eugene E. Irvin,* JAGC, USN (on brief).

For Appellee: *Lieutenant M. Eric Ever-
sole,* JAGC, USNR (argued); *Lieutenant
Omar R. Lopez,* JAGC, USNR (on brief).

Judge EFFRON delivered the opinion of
the Court.

Following arraignment at a general court-
martial on a charge of rape, *see* Art. 120,
Uniform Code of Military Justice, 10 USC
§ 920, appellee moved to suppress DNA evi-
dence obtained from a vial of his blood. The
military judge granted the motion, the Gov-
ernment appealed under Article 62(a)(1)(B)
and (a)(2), UCMJ, 10 USC § 862(a)(1)(B) and
(a)(2), and the Court of Criminal Appeals
affirmed the ruling of the military judge. 52
MJ 504 (1999). Thereafter, the Judge Advo-
cate General certified the case to this Court,
*see* Art. 67(a)(2), UCMJ, 10 USC § 867(a)(2),
asking us to address the following issues:

I. WHETHER MILITARY RULE OF
EVIDENCE 312(f) IS APPLICABLE TO
MEMBERS OF THE TEMPORARY
DISABILITY RETIRED LIST.

II. IF MILITARY RULE OF EVI-
DENCE 312(f) APPLIES TO APPEL-
LEE, WHETHER THE SAMPLE OF
HIS BLOOD SEIZED DURING A MED-
ICAL PROCEDURE IS ADMISSIBLE
UNDER MIL. R. EVID. 312(f).

For the reasons set forth below, we answer
the first question in the affirmative. We
return this case for consideration of the is-
sues raised by the second question, in light of
our opinion, during further court-martial pro-
ceedings.

## I. BACKGROUND

In November 1997, Naval Criminal Investigative Service (NCIS) investigators determined that appellee was a possible suspect in a November 1992 rape of a military dependent ·in Hawaii, where appellee had been stationed. At that time, appellee was assigned to the temporary disability retired list (TDRL), *see* Part II, *infra,* and was being treated for diabetes at the Veterans Administration (VA) hospital in Memphis, Tennessee.

During the investigation, the NCIS sought to obtain a sample of appellee's blood for purposes of making a DNA comparison between his blood and the samples of blood and semen gathered at the time of the crime. The NCIS asked the VA hospital to obtain a blood sample from appellee the next time he presented himself for a physical examination in which a blood sample would be taken during the normal course of his treatment.

According to the stipulation of fact agreed to by both parties at trial:

> On 3 June 1998, blood was drawn from Stevenson by staff of the VA Hospital in Memphis, TN. This was accomplished by inserting one vacuum needle (with an open end) into Stevenson's arm. While this needle was in his arm, one tube of blood was drawn for treatment and diagnosis of his diabetes. Within five or six seconds after the first tube was withdrawn from the needle, hospital staff inserted a second tube in order to obtain a separate blood sample for NCIS. When the second tube was filled and withdrawn, hospital staff withdrew the needle out of Stevenson's arm. The needle was in Stevenson's arm during the entire time both tubes were filled.

The findings of fact by the military judge added:

> The initial tube of blood drawn on 3 June 1998 occurred during a normally scheduled medical visit and was drawn for medical purposes to monitor the accused's diabetes.

> The second tube of blood drawn on 3 June 1998 was drawn *solely* for law enforcement purposes at the request of NCIS and was not drawn for any medical purpose.

* * *

The VA hospital staff obtained the accused's consent to draw blood for medical purposes. The VA hospital staff did not, however, tell the accused that a second tube of blood would be drawn solely for forensic purposes for use in the [rape] investigation, nor did he give consent for a second tube of blood to be drawn for that purpose.

## II. THE TEMPORARY DISABILITY RETIRED LIST

If a servicemember while on active duty becomes disabled, the Service Secretary may retire the member with pay, subject to detailed statutory and regulatory procedures. These procedures provide two basic types of disability retirement—permanent and temporary. When there is a determination that a disability is "permanent ... and stable," the Service Secretary may retire the member with pay. 10 USC § 1201. If, however, the disability "may be of a permanent nature," but the circumstances do not permit a final determination that the condition is, in fact, "permanent ... and stable," the Secretary is required to place the member on the "temporary disability retired list, with retired pay." 10 USC § 1202.

While on the TDRL, a member is required to submit to periodic physical examinations "to determine whether there has been a change in the disability for which he was temporarily retired." Failure to submit to such a periodic examination may lead to termination of retired pay. 10 USC § 1210(a).

When a periodic examination leads to a determination that the member is "physically fit" to perform his or her duties, there are a number of options. The member may be returned to active duty with his or her consent, retired if otherwise eligible for retirement, discharged, or transferred to the inactive reserves. If the member does not consent to a proposed return to active duty, "his status on the temporary disability retired list and his disability retired pay shall be terminated as soon as practicable and the member shall be discharged." 10 USC § 1211(c).

If a member remains on the TDRL for 5 years, the Secretary is required to make a final determination. If there is a determination that the disability "still exists," it is considered at that point to be "permanent ... and stable," and the member is retired. 10 USC § 1210. If the member is determined to be fit for duty, the service has the same options as when such a determination is the result of a periodic examination: return to active duty with consent, retirement if otherwise eligible, discharge, or transfer to the inactive reserves.

■ In *United States v. Bowie*, 14 USC-MA 631, 34 CMR 411, 1964 WL 5038 (1964), our Court held that members on the TDRL are subject to court-martial jurisdiction under Article 2, which includes jurisdiction over retired members who are entitled to pay. *See* Art. 2(a)(4), UCMJ, 10 USC § 802(a)(4). We specifically noted the potential for recalling persons on the TDRL to active duty, particularly in times of national need. 14 USCMA at 632, 34 CMR at 412.

### III. DISCUSSION

A. *Applicability of Mil. R. Evid. 312(f) to Members on the TDRL*

■ At trial and on appeal, the Government has relied on Mil. R. Evid. 312(f), Manual for Courts–Martial, United States (1998 ed.), which provides:

> Nothing in this rule [dealing with admissibility of evidence obtained from "body views and intrusions"] shall be deemed to interfere with the lawful authority of the armed forces to take whatever action may be necessary to preserve the health of a servicemember. Evidence or contraband obtained from an examination or intrusion conducted for a valid medical purpose may be seized and is not evidence obtained from an unlawful search or seizure within the meaning of Mil. R. Evid. 311.

As noted by the Court below, "[t]he sole basis offered by the Government for the admissibility of the ... [evidence] is that it was obtained as a result of an intrusion conducted for a valid medical purpose, as authorized by Mil. R. Evid. 312(f)." 52 MJ at 508. The

Government has not contended that the evidence in question was obtained as a result of any of the other rules governing probable cause and non-probable cause searches and seizures. *See id.*

There is no exclusion under the Military Rules of Evidence for members on the TDRL. Mil. R. Evid. 1101(a), entitled "Rules applicable," provides: "Except as otherwise provided in this Manual, these rules apply generally to all courts-martial ...." Subsection (d) of that rule, entitled "Rules inapplicable," contains no indication that the Rules are not applicable to persons on the TDRL, nor is there anything elsewhere in the Manual for Courts–Martial that would exempt members on the TDRL from Mil. R. Evid. 312(f).

The court below asserted, however, that the military services do not rely on members on the TDRL to perform military missions. In its view, application of Mil. R. Evid. 312(f) to persons on the TDRL would violate the Fourth Amendment because the rule is not a "needed exception to the Fourth Amendment protections applicable to the general populace based upon military exigencies." 52 MJ at 510.

We do not agree with the lower court's assessment of the TDRL. The exercise of court-martial jurisdiction over members on the TDRL, as affirmed in *Bowie*, underscores the continuing military status of a member on the TDRL, even if the member is not then performing regular duties. Court-martial jurisdiction reflects the statutory concept that the TDRL is a "temporary" assignment, not a permanent separation from active duty. Congress expressly denominated status on the TDRL as "temporary" and specifically required members on the TDRL to undergo periodic physical examinations to determine whether each member is "physically fit to perform" military duties. 10 USC § 1210(f).

The statutory requirement that a member consent to return to active duty does not diminish the interest of the military in the member's fitness for duty while on the TDRL. The detailed statutory provisions for return to duty reflect a congressional expec-

tation that servicemembers who are determined to be fit for duty, and who thereby lose entitlement to retirement pay, may well seek to return to duty after receiving a fitness determination—whether motivated by patriotism, financial interest, or other considerations. *See, e.g., Craft v. United States*, 544 F.2d 468, 210 Ct.Cl. 170 (1976) (holding that the service erred in finding unfit for duty a servicemember who sought to return to active duty).

Moreover, even if a member on the TDRL is finally determined to be unfit for duty and is retired for physical disability, the member retains military status and may be recalled to active duty under certain circumstances. *See, e.g., Akol v. United States*, 167 Ct.Cl. 99 (1964) (wartime needs required recall to active duty of servicemembers who had been retired for physical disability); *cf. McCarty v. McCarty*, 453 U.S. 210, 222, 101 S.Ct. 2728, 69 L.Ed.2d 589 (1981)(discussing amenability of non-disability retirees to UCMJ jurisdiction and recall to active duty).

Under the lower court's view of the law, a person on the TDRL observed using an illegal drug could be tried and convicted by court-martial, so long as the prosecution did not rely on evidence obtained under Mil. R. Evid. 312(f). If, however, bodily fluids extracted during a routine medical examination of a person on the TDRL reflected the same or a greater level of drug abuse, the lower court's ruling would preclude prosecution if the only evidence was obtained through a medical examination covered by Mil. R. Evid. 312(f). We do not agree that the Constitution requires such an anomaly. The constitutional considerations that support the exercise of court-martial jurisdiction over a military member on the TDRL—the receipt of military pay and continuing military status—are no less significant when it comes to the use of evidence obtained during a valid medical procedure concerning the member's continued fitness for military duty.

In view of the receipt of military pay and the potential for further active duty service by members who are temporarily removed from active duty by reason of disability, we conclude that evidence obtained in compliance with Mil. R. Evid. 312(f) may be used in a court-martial of a person on the TDRL.

## B. Application of Mil. R. Evid. 312(f) to Appellee

The parties appear to agree that insertion of the needle into appellee's arm and extraction of the first vial of blood was undertaken for a "valid medical purpose" and was "necessary to preserve the health of a servicemember." Under the plain language of Mil. R. Evid. 312(f), if some of the blood in the first vial was made available to the NCIS for its investigative purposes, any evidence relating thereto would be admissible.

The prolonged insertion of the needle to extract a second vial of blood, solely for law enforcement purposes, raises a separate question under Mil. R. Evid. 312(f). In *United States v. Fitten*, 42 MJ 179 (CMA 1995), our Court unanimously upheld under Rule 312(f) the taking of a second bottle of urine for command investigation purposes when the catheterization and taking of the first bottle of urine was for a medical purpose. We noted that taking the second bottle of urine had only "a *de minimis* impact by prolonging the flow of urine only long enough to fill the second bottle." *Id.* at 182. Under the circumstances of a *de minimis* intrusion, we concluded that the intrusion did not violate the Fourth Amendment or the Military Rules of Evidence.

In any further proceedings in the present case concerning admissibility of the evidence at issue, the military judge will need to determine—in light of *Fitten*—whether the prolonged intrusion of the needle in appellee's arm while a second vial was placed on the vacuum needle, and then for some additional period while the blood was extracted into the vial, was a *de minimis* intrusion with respect to the Fourth Amendment and Mil. R. Evid. 312(f). In determining whether *Fitten* permits admission of the evidence at issue, the military judge should include in his consideration the effects of the type of intrusion, the length of the prolonged insertion, the quantity of fluid extracted, the nature of the fluid extracted, and whether there is a legally significant difference between the na-

ture of the fluid extracted in this case as compared to *Fitten* (*e.g.*, blood versus urine).

### IV. DECISION

The first certified question is answered in the affirmative. Accordingly, the decision of the United States Navy–Marine Corps Court of Criminal Appeals is reversed, and the case is returned to the Judge Advocate General of the Navy for remand to the court-martial for trial on the merits. Upon appropriate motion at such trial, the military judge shall consider the issues raised by the second certified question in light of this opinion.