UNITED STATES, Appellee

v.

Ivor G. LUKE, Hospital Corpsman Second Class
U.S. Navy, Appellant

No. 05-0157

Crim. App. No. 200000481

United States Court of Appeals for the Armed Forces

Argued September 22, 2005, and February 7, 2006

Decided April 7, 2006

EFFRON, J., delivered the opinion of the Court, in which GIERKE,
C.J., and CRAWFORD and BAKER, JJ., joined.  ERDMANN, J., filed a
dissenting opinion.

<u>Counsel</u>

For Appellant:  <u>Captain Peter H. Griesch</u>, USMC (argued); <u>Captain
James D. Valentine</u>, USMC (on brief).


For Appellee:  <u>Major Wilbur Lee</u>, USMC (argued); <u>Commander
Charles N. Purnell II</u>, JAGC, USN (on brief); <u>Lieutenant Colonel
William K. Lietzau</u>, USMC.


Amicus Curiae:  <u>Christopher A. Turtzo</u> (law student)(argued);
<u>Shaun P. Martin</u>, Esq. (professor) (on brief) – the University of
San Diego School of Law at the September 22, 2005, oral
argument.

Military Judge:  Charles A. Porter


<u>**THIS OPINION IS SUBJECT TO REVISION BEFORE FINAL PUBLICATION**</u>.

United States v. Luke, No. 05-0157/NA

Judge EFFRON delivered the opinion of the Court.

At a general court-martial composed of officer and enlisted members, Appellant was convicted, contrary to his pleas, of two specifications of indecent assault, in violation of Article 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 934 (2000). He was sentenced to a bad-conduct discharge and confinement for two years. The convening authority approved these results, and the United States Navy-Marine Corps Court of Criminal Appeals affirmed in an unpublished opinion. United States v. Luke, No. NMCCA 200000481, 2004 CCA LEXIS 218, 2004 WL 2187577 (N-M. Ct. Crim. App. Sept. 28, 2004).

On Appellant's petition, we granted review and held oral argument on two issues.[1] Subsequently, we granted review of the following supplemental issue:

> WHETHER APPELLANT'S CONVICTION CAN BE
> AFFIRMED BY THIS COURT IN LIGHT OF THE FACT
> THAT EVIDENCE OF FRAUDULENT TESTING OF DNA
> HAS BEEN NEWLY DISCOVERED.

---

[1]  I.  WHETHER THE LOWER COURT ERRED WHEN IT UPHELD THE TRIAL JUDGE'S EXCLUSION, DURING CROSS-EXAMINATION, OF AN ALLEGED VICTIM'S ABORTION AFTER IT BECAME RELEVANT AND MATERIAL REBUTTAL TO THE VICTIM'S TESTIMONY.

II. WHETHER THE LOWER COURT ERRED WHEN IT UPHELD THE GOVERNMENT'S FAILURE TO DISCLOSE EVIDENCE THAT IT HAD PREPARED TO USE ON RE-DIRECT EXAMINATION OF A GOVERNMENT WITNESS.

We heard argument on these two issues on September 22, 2005, at the University of San Diego School of Law in San Diego, California, as part of this Court's "Project Outreach." See United States v. Mahoney, 58 M.J. 346, 347 n.1 (C.A.A.F. 2003).

For the reasons set forth below, we hold that Appellant has brought forth sufficient evidence to warrant further inquiry under United States v. DuBay, 17 C.M.A. 147, 37 C.M.R. 411 (1967), as to whether a Government forensic examiner contaminated Appellant's DNA sample or otherwise falsified pertinent test results.  In view of our disposition on the supplemental issue, it would be premature to address the first two granted issues at this time.

## I.  FACTS

### A.  BACKGROUND

Appellant served as a hospital corpsman aboard the USS PORT ROYAL.  Appellant was charged with indecently assaulting a female shipmate, Seaman Recruit N.  The chain of events leading to the charged offense began when Seaman Recruit N's boyfriend, Fireman A, sought medical treatment from Appellant for a stomach pain.  Appellant, in the course of examining Fireman A, noticed a skin rash on Fireman A.  During a discussion about possible causes of the rash, Fireman A told Appellant that he was in a sexual relationship with Seaman Recruit N.

Seaman Recruit N testified that she went to the ship's medical spaces later that day because Appellant told her that she needed to be examined for a sexually transmitted disease.  According to Seaman Recruit N, Appellant directed her into a

back room, where he had her lie on a bed.  She stated that Appellant, under the guise of performing a medical examination, sexually assaulted her.

Appellant's testimony provided a different version of what happened after Fireman A revealed his relationship with Seaman Recruit N.  According to Appellant, he informed Fireman A that he would have to report the relationship to the command.  Fireman A tried to dissuade Appellant from making a report and then left the medical spaces.  Appellant stated that Seaman Recruit N later arrived at the medical spaces because she was looking for Fireman A.  According to Appellant, she went into the back room of the medical spaces, and then emerged teary-eyed and stated that she was tired of the Navy and was ready to get out.  Appellant testified that she then left the medical spaces and that he went to sleep on the bed in the back room.

Seaman Recruit N and Fireman A both testified about the ship's policy prohibiting relationships with other members of the ship's company.  Each stated that they knew at the time of the charged incident that the relationship was in violation of the policy.

### B.  DNA EVIDENCE PRESENTED AT TRIAL

In addition to the testimony of Fireman A and Seaman Recruit N, the Government relied upon DNA evidence to convict Appellant.  Naval Criminal Investigative Service agents

collected the bra that Seaman Recruit N wore on the day of the alleged assault and a bed sheet from the bed where the alleged assault took place. Both were sent to the United States Army Criminal Investigation Laboratory (USACIL) at Fort Gillem, Georgia, for analysis.

Mr. Phillip Mills, then a forensic chemist at USACIL, Fort Gillem, Georgia, testified for the prosecution. Mr. Mills explained that he examined the bed sheet and the bra for stains that contained saliva. He stated that each contained cells from which DNA could be obtained, so a portion of each was preserved for another examiner who would perform DNA tests.

The forensic chemist who examined the DNA also testified for the prosecution. She stated that the DNA on the sheet and bra was consistent with a mixture of DNA taken from blood samples of Appellant and Seaman Recruit N. The prosecution also introduced an expert in statistical genetics to interpret the DNA evidence. The expert testified regarding the likelihood that the DNA was from Appellant and Seaman Recruit N, as compared to unknown individuals.

### C. POST-TRIAL DEVELOPMENTS

On August 25, 2005, over six years after Appellant's court-martial and one month prior to the oral argument on the two issues originally granted by this Court, USACIL at Fort Gillem,

Georgia, issued a memorandum to all staff judge advocates.  The

memorandum stated in pertinent part:

> 2.  In April 2005, an internal quality
> control review detected a suspected false
> entry made by a DNA examiner that made the
> test invalid.  The examiner was suspended
> from his DNA casework on 3 May 2005.  In an
> inquiry initiated on 2 June 2005, the
> examiner admitted the false entry.
>
> 3.  In January 2004, the same examiner was
> suspended from DNA casework after permitting
> contamination in his testing process.  After
> retraining, he was returned to casework on
> 13 September 2004, initially working one
> case at a time under supervision.

The memorandum contained an attachment that listed the cases in

which the examiner performed tests.  The list included

Appellant's case.

On October 17, 2005, USACIL at Fort Gillem, Georgia, issued

another memorandum to all staff judge advocates detailing

improper practices of the examiner.  The memorandum stated, in

pertinent part:

> 2.  In December 2003, Mr. Phillip R. Mills,
> a USACIL Forensic DNA Examiner, cross-
> contaminated and/or switched samples within
> and between the following cases . . . .
>
> 3.  Consequently, Mr. Phillip R. Mills, a
> USACIL Forensic DNA Examiner, was suspended
> from performing DNA case work from January
> 2004 through September 2004.
>
> 4.  In April 2005, Mr. Phillip R. Mills, a
> USACIL Forensic DNA Examiner, altered
> documentary evidence in USACIL case number .
> . . .

5. In April 2005, Mr. Phillip R. Mills, a USACIL Forensic DNA Examiner, entered false data regarding a control sample in USACIL case number . . . .

6. Mr. Phillip R. Mills, a USACIL Forensic DNA Examiner, was suspended from performing forensic DNA analysis at USACIL on 3 May 2005; however, he remained an USACIL employee.

7. Mr. Phillip R. Mills, a USACIL Forensic DNA Examiner, admitted to making a false data entry and creating a false document in USACIL case number . . . in a written statement made on 2 June 2005.

8. On 9 June 2005, Mr. Phillip R. Mills, a USACIL Forensic DNA Examiner, wrote a memorandum response to the technical review findings in USACIL case number . . . ; therein, he misrepresented he had examined evidence when he had not.

9. Mr. Phillip R. Mills, a USACIL Forensic DNA Examiner, in USACIL case number . . . , examined only a single swab which had been submitted for evidence along with additional swabs. On 13 April 2005, Mr. Mills represented he had examined evidence and found negative results. Mr. Mills had not examined all available evidence. The evidence in USACIL case number . . . , when tested by another a USACIL Forensic DNA Examiner, yielded positive DNA results.

The forensic examiner whose activities were described in this memorandum was the same examiner who testified about the saliva tests and presence of DNA in the bed sheet and bra for the Government at Appellant's court-martial.

7

## II.   ANALYSIS

The supplemental issue asks whether Appellant's conviction can be affirmed in light of the newly discovered evidence regarding DNA testing at the laboratory that tested Appellant's DNA, which included problems of cross-contamination, misrepresentation, false data entries, and analytical deficiencies.  The critical question is whether the results of trial are reliable in view of the newly discovered evidence. See United States v. Murphy, 50 M.J. 4, 15-16 (C.A.A.F. 1998).

The defense has identified two memoranda issued by the laboratory detailing improper practices by Mr. Mills.  At trial, Mr. Mills testified that he performed saliva tests on the bed sheet and bra and that the evidentiary samples of DNA collected from the items came from the stains he examined.  DNA testing involves comparing an evidentiary sample with a known sample. Mr. Mills' testimony revealed he had access to the evidentiary samples tested in Appellant's case.  This access could have provided Mr. Mills with the opportunity to engage in the improper practices described in the USACIL memoranda, such as cross-contamination, alteration of evidence, and entry of false data -- matters that could have a direct bearing on the reliability of the findings.

The Government has not challenged the defense position that Mr. Mills had access to and participated in testing the samples

8

from which DNA was extracted in Appellant's case. The Government contends that Appellant is not entitled to relief because the memoranda do not conclude that Mr. Mills' testing was flawed in Appellant's case -- only in subsequent, unrelated cases.

Whether Mr. Mills engaged in the improper activities detailed in the memoranda in Appellant's case is a factual question that this Court is not in a position to resolve. At this stage, Appellant has demonstrated that there are material questions of fact that could give rise to relief in the context of his case. See Murphy, 50 M.J. at 16. Appellant's showing that Mr. Mills is known to have been involved in such behavior and that Mr. Mills had access to the evidentiary samples tested in Appellant's case is sufficient to trigger an evidentiary hearing into whether Appellant's sample was contaminated or the test results were otherwise falsified.

### III. DECISION

The decision of the United States Navy-Marine Corps Court of Criminal Appeals is set aside. The record of trial is returned to the Judge Advocate General of the Navy for submission to an appropriate convening authority for a factfinding hearing on Appellant's claim of contamination of his DNA sample and falsification of his test results. See DuBay, 17

C.M.A. at 149, 37 C.M.R. at 412.  In light of the potential implications for other cases involving the same Government examiner, we urge completion of the DuBay hearing within ninety days of the issuance of this opinion, if practicable. Thereafter, the record will be returned directly to this Court for further review in accordance with Article 67, UCMJ, 10 U.S.C. § 867 (2000).

ERDMANN, Judge (dissenting):

The majority concludes that the post-trial materials relating to Mr. Mills' alleged misconduct raise material questions of fact that could give rise to relief and that further inquiry is warranted. As I find that the circumstances of this case do not warrant extending the period within which to seek a new trial on the basis of newly discovered evidence, I do not agree that a factfinding hearing under United States v. DuBay, 17 C.M.A. 147, 37 C.M.R. 411 (1967), is warranted. I therefore respectfully dissent.

In the context of a petition for new trial under Article 73, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 873 (2000), a petitioner has two years after the convening authority takes action within which to bring a petition for new trial based on newly discovered evidence. Since the new evidence in Luke's case did not come to light until almost five years and five months after the convening authority's action, this new evidence does not support a petition for new trial under Article 73, UCMJ.

Luke argues that despite this statutory language, a motion for a new trial based on newly discovered evidence may be bought if a case is in the course of appeal, relying on United States v. Harris, 61 M.J. 391 (C.A.A.F. 2005), and United States v.

Murphy, 50 M.J. 4 (C.A.A.F. 1998).[1]  Murphy was a capital case in which Murphy sought a new trial based on newly discovered expert scientific evidence bearing on his mental responsibility.  50 M.J. at 13-14.  Despite the fact that this evidence arose well after the two-year time period under Article 73, UCMJ, this court applied the Rule for Courts-Martial (R.C.M.) 1210(f)(2) new trial analysis to his request for a new trial.  Id. at 15. We did so because it was a capital case calling for this court to carefully scrutinize the case for "reliability of result." Id. at 14.[2]  Capital litigation is unquestionably different and the need to assure a reliable result warrants different treatment.  See Ring v. Arizona, 536 U.S. 584, 605-06 (2002) ("There is no doubt that 'death is different'."); Loving v. United States, 62 M.J. 235, 236 (C.A.A.F. 2005); United States v. Curtis, 32 M.J. 252, 255 (C.M.A. 1991).

Harris, on the other hand, does not support the proposition that R.C.M. 1210(f)(2) should be applied beyond the two-year

_____

[1] Luke asserts that the test to be applied in this circumstance is the same test as set forth in Rule of Courts-Martial 1210(f)(2) for a petition for new trial based on newly discovered evidence under Article 73, UCMJ.

[2] In addition, "mental responsibility" occupies a preferred position in military jurisprudence.  See United States v. Massey, 27 M.J. 371, 373 (C.M.A. 1989); United States v. Jacks, 8 C.M.A. 574, 577, 25 C.M.R. 78, 81 (1958); Manual for Courts-Martial, United States, Analysis of the Military Rules of Evidence app. 22 at A22-7 (2005 ed.).

Article 73, UCMJ, period.  Although dealing with evidence of mental responsibility discovered after trial, Harris actually filed a petition for new trial within two years of the convening authority's action.  60 M.J. at 394.[3]

I do not find that either Murphy or Harris support a broad extension of the right to a new trial based on newly discovered evidence simply because a case remains in appellate channels more than two years after the convening authority's action.  Nor does this case present the compelling circumstances that we faced in Murphy.  In this non-capital case the new evidence of Mr. Mills' misconduct could at most be offered under Military Rule of Evidence 608(b) to impeach his trial testimony.  This is not evidence rising to the level of a defense as does evidence of lack of mental responsibility.  See R.C.M. 916(k).

I would hold that a DuBay hearing is not appropriate and would proceed to consideration of the remaining issues in this case.

---

[3] Even though Harris did file a timely petition for new trial, I am open to the possibility of applying the new trial analysis in non-capital cases where the proffered new evidence goes to the reliability of the findings of guilt rather than the credibility of a witness.