UNITED STATES

v.

Walter S. STEVENSON, Hospital
Corpsman Third Class (E–4),
U.S. Navy.

NMCCA 200301272.

U.S. Navy–Marine Corps Court
of Criminal Appeals.

Sentence Adjudged 31 Oct. 2001.

Decided 24 July 2006.

LCDR M. Eversole, JAGC, USNR, Appellate Defense Counsel.

LT Stephen Reyes, JAGC, USNR, Appellate Defense Counsel.

Capt Glen Hines, USMC, Appellate Government Counsel.

Before ROLPH, Chief Judge, SCOVEL, Senior Judge, and HARTY, Appellate Military Judge.

HARTY, Judge:

A general court-martial, composed of officer and enlisted members, convicted the appellant, contrary to his pleas, of rape, in violation of Article 120, Uniform Code of Military Justice, 10 U.S.C. § 920. The appellant was sentenced to confinement for 3 years and a dishonorable discharge. The convening authority approved the sentence as adjudged and, except for the dishonorable discharge, ordered it executed.

This case is before us for the second time. We first addressed this case in response to the Government's interlocutory appeal of the military judge's order suppressing evidence. The military judge suppressed the DNA test results of the appellant's blood drawn by the Veterans' Administration hospital, holding that the results were not admissible under MIL. R. EVID. 312(f), MANUAL FOR COURTS-MARTIAL, UNITED STATES (1998 ed.), because the appellant was not a "servicemember" at the time the blood was drawn. Appellate Exhibit XV.[1] This court affirmed the military judge's decision in *United States v. Stevenson,* 52 M.J. 504 (N.M.Ct.Crim.App.1999)(*Stevenson I*). Our superior court disagreed and returned the appellant's case to the Judge Advocate General of the Navy for remand to the court-martial for trial on the merits. *United*

---

1. The record contains appellate exhibits identified by Roman numerals and others by Arabic numerals. We will refer to appellate exhibits by the exhibit number appearing on that exhibit.

*States v. Stevenson,* 53 M.J. 257 (C.A.A.F.2000)(*Stevenson II*). This case proceeded to trial and is now before us for appellate review.

We have considered the record of trial, the appellant's nine assignments of error,[2] and the Government's Answer. We find that the appellant is entitled to sentence relief due to post-trial delay. Otherwise, we find that the findings and sentence are correct in law and fact and that no error materially prejudicial to the substantial rights of the appellant was committed. *See* Arts. 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a) and 866(c).[3]

## Background

On 23 November 1992, KT was raped by an unidentified assailant in her base housing apartment in Honolulu, Hawaii. The rape was immediately reported and a rape kit examination was performed. A special agent of the Naval Criminal Investigative Service (NCIS) was present during the exam, took custody of the evidence obtained, and logged the rape kit into the NCIS evidence facility. A different NCIS special agent collected physical evidence from KT's apartment, including cuttings from the mattress upon which the rape occurred. This evidence was also logged into the NCIS evidence facility.

The seized evidence was sent to the United States Army Criminal Investigation Laboratory USACIL to extract high molecular weight deoxyribonucleic acid (DNA) for comparison and identification purposes. Part of the extracted DNA was consumed in the original examination conducted by Restriction Fragment Length Polymorphism (RFLP), and the balance was frozen for later use. The rape kit and mattress cuttings were returned to NCIS in Hawaii.

In July and August 1994, less than two years after KT was raped, NCIS destroyed the rape kit samples, mattress cuttings, fingerprints lifted from the victim's purse that had been found at a local mall, and all chain-

2. I. THE UNITED STATES NAVY VIOLATED ARTICLE 2(A)(4) OF THE UCMJ AND THE UNITED STATES CONSTITUTION BY EXERCISING COURT–MARTIAL JURISDICTION OVER [THE APPELLANT].

II. THE MILITARY JUDGE VIOLATED THE FOURTH AMENDMENT BY ADMITTING BLOOD AND DNA EVIDENCE TAKEN FROM [THE APPELLANT] ON 3 JUNE 1998.

III. THE MILITARY JUDGE ERRED BY ADMITTING BLOOD AND DNA EVIDENCE SEIZED PURSUANT TO AN INVALID SEARCH WARRANT ISSUED ON 15 SEPTEMBER 1999.

IV. APPELLANT'S RIGHT TO EQUAL ACCESS TO EVIDENCE WAS DENIED WHEN THE NAVAL CRIMINAL INVESTIGATIVE SERVICE DESTROYED POTENTIALLY EXCULPATORY EVIDENCE, THUS PREVENTING APPELLANT FROM OBTAINING A FAIR TRIAL.

V. THE MILITARY JUDGE ERRED BY ADMITTING DNA RESULTS THAT WERE BASED ON EVIDENCE THAT CONTAINED SERIOUS DEFECTS IN ITS CHAIN OF CUSTODY. (Numbered as assignment of error # 4, Appellant's brief of 27 Dec 2004 at 52).

VI. THE EVIDENCE WAS FACTUALLY INSUFFICIENT TO CONVICT APPELLANT OF RAPE BECAUSE THE GOVERNMENT WAS UNABLE TO DEMONSTRATE WITH RELIABLE EVIDENCE THAT APPELLANT WAS THE ASSAILANT. (Numbered as assignment of error # 5, Appellant's Brief at 54).

VII. THE DEFENSE DEMONSTRATED WITH CLEAR AND CONVINCING EVIDENCE THAT APPELLANT WAS LEGALLY INSANE AT THE TIME OF THE ALLEGED INCIDENT. (Numbered as assignment of error # 6, Appellant's brief at 57).

VIII. THIS COURT SHOULD PROVIDE APPELLANT WITH SENTENCING RELIEF FOR THE INORDINATE AND EXCESSIVE POST–TRIAL DELAY. (Numbered as assignment of error # 7, Appellant's Brief at 59).

IX. BECAUSE THE OFFENSE OF RAPE IS NOT PUNISHABLE BY DEATH, THE STATUTE OF LIMITATIONS FOR RAPE IS FIVE YEARS AND, THEREFORE, THE MILITARY JUDGE ERRED IN FINDING THAT THE STATUTE OF LIMITATIONS HAD NOT EXPIRED.

3. An employee of the United States Army Criminal Investigation Laboratory (USACIL) who has the same name as the USACIL employee identified in *United States v. Luke,* 63 M.J. 60, 62 (C.A.A.F.2006), was involved in the basic serology identification of bodily fluids and blood typing of evidence in the appellant's case in 1993. Record at 1060. The Government, in response to Orders to Show Cause, has produced USACIL documents concerning that employee's misconduct occurring in 2003 and 2005. However, the Government has not been able to verify that employee's involvement in the appellant's case. Assuming that the same employee was involved in the appellant's serology, we conclude that: (1) there is no evidence of USACIL misconduct in the appellant's case; (2) there was no way for the Government, in 1993, to know that the USACIL employee identified in *Luke* would be involved in misconduct in 2003 and 2005; and (3) there is no possibility that the USACIL employee's misconduct in 2003 and 2005 could be exculpatory evidence requiring disclosure in 1998.

of-custody documents. Other evidence was returned to the victim. At the time of destruction, additional DNA could have been extracted from the destroyed rape kit samples and mattress cuttings.

At the time of the rape, the appellant lived in the same base housing development as KT. In July 1994, the appellant was transferred to the temporary disability retirement list (TDRL) with a 30% disability rating, because he suffered, in part, from a mental illness diagnosed as schizophreniform.[4] The Veteran's Administration (VA), however, rated the appellant as 100% disabled in the fall of 1994. In December 1994, the appellant waived his right to receive military disability retired pay in favor of receiving greater compensation from the VA. This election, however, did not remove the appellant from the TDRL.

In 1995, a cold-case NCIS special agent was assigned to review the unsolved rape of KT. This agent found a report of the appellant looking into a different woman's bedroom window late at night in KT's housing area. The report stated that the appellant was positively identified by the apartment's occupant, who stated that the appellant was naked as he peered in her window. This incident predated KT's rape by approximately six months. Based on this lead, the special agent obtained the appellant's blood type through the Defense Enrollment Eligibility Reporting System (DEERS) and discovered it was the same as the person who raped KT, according to USACIL. At this point, NCIS wanted to include or exclude the appellant as a possible suspect by obtaining blood or other samples from the appellant for DNA analysis. The case was officially reopened in November, 1997.

Rather than requesting a blood sample directly from the appellant, NCIS contacted the VA and requested that additional blood be drawn from the appellant the next time he reported for routine blood work. In June 1998, the appellant reported to the Memphis VA Hospital for a routine blood draw for his diabetes check. The lab technician drew

blood for medical purposes and, without removing the needle from the appellant's arm, drew a second tube of blood for the NCIS. The NCIS picked the blood up and sent it to USACIL for DNA testing. The appellant was not informed that the second tube of blood was drawn for law enforcement purposes.

USACIL conducted DNA testing on the appellant's blood and determined that when compared to the DNA extracted from KT's rape kit and mattress cuttings, the appellant's profile frequency in the unrelated African–American population in the U.S. established that he was the individual who committed the rape.[5] USACIL consumed the last of the extracted DNA during this testing. With the Secretary of the Navy's authorization, a single charge of rape was preferred on 16 December 1998. The appellant was arrested the next day and placed in pretrial confinement, but was not returned to active duty.

On 15 September 1999, following the filing of its interlocutory appeal but before this court issued its decision on that appeal in *Stevenson I*,[6] NCIS obtained a search warrant from a U.S. Magistrate Judge to seize a sample of the appellant's blood. That warrant was executed on 22 September 1999, and the seized evidence was sent to USACIL for DNA analysis. Using the same RFLP analysis as before, USACIL came up with the same approximate frequency of the appellant's profile within the same population as before.

### Jurisdiction

■ For his first assignment of error, the appellant claims there was no personal jurisdiction to try him by court-martial. Specifically, the appellant asserts that although he was transferred to the TDRL, he waived his right to receive military disability retired pay in favor of receiving disability compensation from the VA. Therefore, he was not "entitled to pay" as required by Article 2(a)(4), UCMJ, 10 U.S.C. § 802(a)(4). Appellant's Brief at 10. The Government summarily

---

4. At time of trial, however, the appellant was diagnosed as suffering from schizophrenia.

5. The appellant is African–American.

6. *Stevenson I* was decided on 10 October 1999.

asserts that our superior court's holding in *Stevenson II* resolves this issue without any need for further discussion.

In resolving whether MILITARY RULE OF EVIDENCE 312(f), MANUAL FOR COURTS-MARTIAL, UNITED STATES (1998 ed.) applies to members of the TDRL, our superior court answered the question in the affirmative, stating in part that

> In view of the receipt of military pay and the potential for further active duty service by members who are temporarily removed from active duty by reason of disability, we conclude that evidence obtained in compliance with Mil. R. Evid. 312(f) may be used in a court-martial of a person on the TDRL.

*Stevenson*, 53 M.J. at 260. Although our superior court cited *United States v. Bowie*, 34 C.M.R. 411, 1964 WL 5038 (C.M.A.1964)(holding that members on the TDRL are subject to court-martial jurisdiction under Article 2, UCMJ) to resolve the MIL. R. EVID. 312(f) issue, the issue of personal jurisdiction under Article 2(a)(4), UCMJ, was not squarely before the court.

In *Bowie*, the issue was whether there was personal jurisdiction for court-martial purposes over a former active duty service member who was placed on the TDRL and was receiving military disabled retired pay. Answering the question in the affirmative, our superior court stated

> [T]he Uniform Code does not distinguish between retirees, on the basis of the reason for retirement; all retirees receiving pay are subject to its provisions. As we noted in the *Hooper* case, there are no "limitations or conditions put upon the exercise of the jurisdiction" over this class of persons.

34 C.M.R. at 412 (quoting *United States v. Hooper*, 26 C.M.R. 417, 420, 1958 WL 3394 (C.M.A.1958)(holding that a person who retires from active duty based on longevity

may be subjected to court-martial jurisdiction for crimes committed after retirement.)).

The case *sub judice*, however, can be distinguished from both *Bowie* and *Hooper*, because each of those cases involved the actual receipt of retired pay. The appellant was not receiving retired pay. He waived that right in favor of receiving VA disability compensation. We do not believe, however, that this distinction changes the analysis or the result.

Article 2(a)(4), UCMJ, provides that "[r]etired members of a regular component of the armed forces who are entitled to pay" are subject to the Uniform Code of Military Justice. A plain reading of that Article indicates the entitlement to receive retired pay, and not the actual receipt of that pay, is the condition precedent to exercising court-martial jurisdiction over a retiree. The appellant had been entitled to military disability retired pay. The narrow question is whether the appellant was still "entitled to pay," and whether that was enough for court-martial jurisdiction.

A member of the TDRL who waives his or her military disability retired pay in favor of VA disability compensation has the option of renouncing the VA disability compensation and returning to his or her prior entitlement to military disability retired pay. *See* Department of Defense Financial Management Regulation, Volume 7B, Paragraph 120204.[7] Under the appellant's theory, a person could avoid court-martial jurisdiction simply by renouncing military disability retired pay in favor of VA disability compensation, while at the same time retaining the option to return to his or her military disability retired pay entitlement.[8] We do not believe that Congress intended such a result.

We hold that a member of the TDRL who has waived military disability retired pay in favor of VA disability compensation is still

---

7. "120204. *Withdrawal.* A retiree who has waived retired pay in favor of VA benefits may withdraw the waiver and elect to receive retired pay at that time. . . . Renouncement of VA benefits does not preclude the retiree from filing a new waiver of retired pay at a later date, enabling the retiree to receive VA benefits again. . . ."

8. Unless the application to return to military disability retired pay is filed within one year of the prior termination, it is treated as a new application. *See* 38 U.S.C. § 5306(b).

"entitled to pay" and, therefore, subject to court-martial jurisdiction pursuant to Article 2(a)(4), UCMJ. This issue is without merit.

## Admissibility of DNA Evidence Obtained From Blood Drawn by VA

For his second assignment of error, the appellant claims the military judge erred by denying the appellant's motion to suppress the DNA analysis of the blood drawn by the VA. Specifically, the appellant asserts that the VA medical personnel were acting as agents of the Government when they seized the appellant's blood without a warrant, and that no exceptions to the warrant requirement applied. Appellant's Brief at 19. We disagree.[9]

■ We review a military judge's ruling on a motion to suppress for abuse of discretion. *United States v. Rodriguez*, 60 M.J. 239, 246 (C.A.A.F.2004)(citing *United States v. Monroe*, 52 M.J. 326, 330 (C.A.A.F.2000)). "We review factfinding under the clearly-erroneous standard and conclusions of law under the de novo standard.... On mixed questions of law and fact ... 'a military judge abuses his discretion if his findings of fact are clearly erroneous or his conclusions of law are incorrect.' " *Id.* (quoting *United States v. Ayala*, 43 M.J. 296, 298 (C.A.A.F. 1995)). " 'In reviewing a ruling on a motion to suppress, we consider the evidence in the light most favorable to the prevailing party.' " *Id.* at 247–48 (quoting *United States v. Reister*, 44 M.J. 409, 413 (C.A.A.F.1996)(internal quotations omitted)).

■ We need not address each issue raised by the appellant in this assignment of error, because the holding in *United States v. Fitten*, 42 M.J. 179 (C.A.A.F.1995), is dispositive.[10] In *Fitten*, the accused was subjected to an involuntary catheterization to obtain a urine sample for medical purposes in a hospital setting by hospital personnel. The accused's command also wanted a urine sample in order to test for drugs, but the accused refused to give a urine sample for that pur-

pose. The hospital obtained a urine sample for its own medical use and an additional urine sample for the command's use. Both urine samples were obtained from the same catheterization. After a thorough review of the case law giving rise to Mil. R. Evid. 312(f), Judge Crawford, writing for a unanimous court, found that the accused did not suffer a violation of any constitutional right, stating, in part:

16. Here, the taking of the body fluid from appellant was motivated by medical personnel concerned for appellant's health. The testing was not directed by the command or law enforcement officials. Rather, the test was conducted by medical personnel in a medical environment. The test was reasonably necessary to determine if there was life-threatening trauma or injury as a result of drugs or alcohol in the blood. The desires of the command had no impact on the initial intrusion and did not cause any additional intrusion. On the contrary, the command's request resulted in a de minimis impact by prolonging the flow of urine only long enough to fill a second bottle.

17. There was a valid medical purpose for the catheterization procedure. It was performed in a hospital by medical personnel. Any "intrusion" was de minimis and does not shock the conscience. For these reasons we hold that there was no violation of appellant's rights under the Fourth Amendment, the Due Process Clause of the Fifth Amendment, or the Military Rules of Evidence.

*Id.* at 182.

Applying the *Fitten* analysis to the case *sub judice*, the military judge entered detailed findings of fact, including, in part, that: (1) the appellant's blood draw was motivated by medical personnel concerned for appellant's health—his diabetes; (2) the blood draw was not directed by law enforcement officials—it was conducted as part of

---

9. Because we find that the appellant's blood drawn by the VA was done lawfully, the appellant's third assignment of error challenging the subsequent search warrant is moot. *See Wong Sun v. United States*, 371 U.S. 471, 487–88, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

10. Our superior court directed the military judge, on remand, to specifically address the *Fitten* analysis. *Stevenson*, 53 M.J. at 260.

the appellant's ongoing medical treatment at the VA hospital; (3) the blood draw was conducted by medical personnel in a VA hospital environment; (4) the NCIS request for a blood sample had no impact on the initial needle intrusion and did not cause any additional intrusion—the first tube of blood was for the VA hospital's use and the second tube was obtained using the initial needle insertion; (5) the NCIS request for a blood sample resulted in a de minimis impact by prolonging the time the needle was in the appellant's arm only by a few seconds—only long enough to collect two cubic centiliters of blood (less than 1/2 teaspoon); and, (6) the initial blood draw was for a valid medical purpose and necessary to preserve the health of a service member. AE CIV.

Our superior court, in *Stevenson II*, directed the military judge to address the additional issue of "whether there is a legally significant difference between the nature of the fluid extracted in this case as compared to *Fitten* (e.g., blood versus urine)." 53 M.J. at 260–61. In response, the military judge distinguished urine and blood, finding that urine is human waste that may contain fleeting evidence of a possible crime, while blood is not a waste product, is not secreted by the human body absent injury or illness, and potentially contains permanent evidence that an individual has or has not committed a crime—DNA. The military judge determined that while the two bodily fluids are qualitatively different, that difference is not legally significant and does not change the *Fitten* analysis. AE CIV at 5, ¶¶ e and f.

The military judge's factual findings are supported by the record, are not clearly erroneous, and we adopt them as our own. Based on our *de novo* review of whether the qualitative difference between urine and blood changes the *Fitten* analysis, we concur with the military judge and conclude that it does not. We further find that the facts in this case are not shocking to the conscience. The military judge did not abuse his discretion. This issue is without merit.

**Destroyed Evidence**

■ For his fourth assignment of error, the appellant claims that the destruction of the rape kit samples and mattress cuttings by NCIS prevented him from receiving a fair trial. Appellant's Brief at 41. We disagree.

"Parties to a court-martial are entitled to an 'equal opportunity to obtain witnesses and other evidence[.]'" *United States v. Rodriguez*, 60 M.J. 239, 246 (C.A.A.F.2004)(quoting Article 46, UCMJ, 10 U.S.C. § 846). They also have the right to "compulsory process." RULE FOR COURTS-MARTIAL 703(a), MANUAL FOR COURTS-MARTIAL, UNITED STATES (1998 ed.). But they are not entitled to the production of evidence that has been destroyed, lost, or is not otherwise subject to compulsory process. R.C.M. 703(f)(2). A military accused also has a constitutional right to the disclosure of material exculpatory evidence. *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). When material exculpatory evidence is not disclosed, the good or bad faith of the Government in destroying that evidence is irrelevant. *Illinois v. Fisher*, 540 U.S. 544, 547, 124 S.Ct. 1200, 157 L.Ed.2d 1060 (2004).

Whether the military judge correctly denied the defense motion to suppress depends on whether the destroyed evidence was "material exculpatory evidence" or simply "potentially useful evidence," and, if the latter, whether NCIS acted in bad faith. *Id.* at 547–48, 124 S.Ct. 1200. "Potentially useful evidence" includes evidence "of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Id.* (quoting *Arizona v. Youngblood*, 488 U.S. 51, 57, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988)). If the Government, in bad faith, destroyed "potentially useful evidence," the exclusionary rule could be invoked. *Id.*

After hearing testimony, observing the witnesses, and hearing argument of counsel, the military judge issued detailed findings of fact. AE 80. These findings include the following: (1) the evidence was destroyed in accordance with the NCIS unwritten standard operating procedure; [11] (2) the evidence

---

11. In 1994, the NCIS unwritten standard operating procedures for destruction of evidence was

as follows: if a suspect had not been identified for an "unreasonable amount of time", it was

was not destroyed with the intent to deny an unknown accused [12] of the opportunity to obtain exculpatory evidence through additional testing; (3) the evidence was not destroyed in bad faith; (4) the appellant failed to show that the destroyed evidence had apparent exculpatory value at the time of destruction; and, (5) the appellant failed to show that the destroyed evidence was essential to a fair trial. *Id.* These findings of fact are supported by the record, are not clearly erroneous, and we adopt them as our own.

In the interest of fairness and to ensure that the appellant received a fair trial, the military judge imposed the following remedies pursuant to R.C.M. 703(f)(2): (1) the Government was not allowed to impeach a defense DNA expert on the grounds that he or she had not actually tested the destroyed rape kit samples or mattress cuttings; (2) the Government was not allowed to offer any evidence concerning the victim's purse or the fingerprints lifted from the purse; (3) the Government was not allowed to offer any evidence showing the proximity of the purse's location to the housing area where the appellant lived; (4) the appellant was allowed to fully develop its theory regarding the greater discriminating ability of the polymerase chain reaction-short tandem repeat (PCR–STR) DNA analysis over the RFLP DNA analysis and that he was denied the opportunity to use the more discriminating analysis because the Government destroyed the evidence; and, (5) the Government was not allowed to bolster or rehabilitate its DNA expert by showing that if the evidence had not been destroyed and was tested using PCR–STR DNA analysis, it could have led to a greater probability of a match between the unknown donor and the appellant's DNA. *Id.* at 9–10, ¶¶ 22 and 23.

We review a military judge's ruling on a motion to suppress for abuse of discretion, and in that process "we consider the evidence 'in the light most favorable to the' prevailing party." *Rodriguez,* 60 M.J. at 246–47 (quot-

ing *Reister,* 44 M.J. at 413). In this case, it is clear that the military judge found that the destroyed evidence was no more than "potentially useful evidence," that it did not have apparent exculpatory value, and that NCIS had not acted in bad faith in disposing of the evidence. These conclusions are clearly supported by the record and the law. Accordingly, we hold that the military judge did not abuse his discretion in denying the motion to suppress, and that the remedies imposed were adequate to ensure that the appellant was not disadvantaged by not being able to conduct independent analysis of DNA extracted from the destroyed evidence.

Even if we were to conclude that the NCIS evidence destruction policy in this case required a firm two-year wait from the date of crime to the date of evidence destruction, and, therefore, that the premature destruction violated that NCIS policy, we still would not grant relief. If NCIS waited until 24 November 2004 to destroy the evidence, the appellant would still be without that evidence. There was no request to retain the evidence, nor could there have been, because the appellant was not developed as a potential suspect until some time in 1995 and not confirmed as a suspect until 1998. Although NCIS, as a result of this case, took remedial measures by establishing an indefinite period of evidence retention for evidence potentially containing DNA, we cannot say that the policy executed in this case was unreasonable at the time. *See United States v. Madigan,* 63 M.J. 118, 121–22 (C.A.A.F. May 1, 2006). This issue is without merit.

### Chain–of–Custody

■ For his fifth assignment of error, the appellant claims the military judge erred by admitting the DNA results, because of defects in the chain of custody for the rape kit samples and mattress cuttings. Specifically, the appellant claims that a proper chain of custody cannot be established because the

---

within the discretion of the Special Agent in Charge—delegated to the Assistant Special Agent in Charge—to order the evidence destroyed. Record at 581–83. The evidence was seized on 23 November 1992 and destroyed on 29 July and 17 August 1994. Prosecution Exhibit 4.

12. The appellant was not developed as a possible suspect until the NCIS cold-case special agent was assigned to the case in 1995. Record at 956. NCIS did not officially re-open the case, however, until November, 1997. AE XV at 1, ¶ 5.

original documents were destroyed. Appellant's Brief at 52. We disagree.

We review challenges to the admissibility of evidence under an abuse of discretion standard. *Ayala,* 43 M.J. at 298; *United States v. Sullivan,* 42 M.J. 360, 363 (C.A.A.F. 1995). With respect to the admissibility of the DNA test results, the Government has the burden of establishing a reasonable probability that the evidence, from which DNA was extracted, was in fact the purported rape kit samples and the mattress cuttings collected in this case, and that the evidence was not altered. *See United States v. Maxwell,* 38 M.J. 148, 150 (C.M.A.1993)(dealing with blood alcohol test results). Although the official chain-of-custody documents for the rape kit samples and mattress cuttings were destroyed with the evidence, the Government may carry its burden by other means.

The NCIS special agent who was present in the hospital examining room during the victim's rape kit examination, and the NCIS special agent who personally collected the mattress cuttings, testified that they personally collected the evidence and delivered it to the NCIS consolidated evidence facility. The NCIS evidence facility's evidence logbook was admitted into evidence showing receipt of that evidence. PE–4. That exhibit shows the evidence was mailed by registered mailed to USACIL for testing. A stipulation of expected testimony shows that packages bearing the same registered mail numbers were received at USACIL. PE 16.

We conclude that the military judge did not abuse his discretion in admitting the DNA analysis based on DNA extracted from the rape kit samples and mattress cuttings. Any gaps in the chain-of-custody go to the weight of the evidence rather than its admissibility. Furthermore, the military judge properly instructed the members that the chain-of-custody was in dispute and that the members must be satisfied beyond a reasonable doubt that the DNA extracted by USACIL came from the rape kit samples that originated from the victim and the mattress

cuttings that came from the crime scene, and that these items were not tampered with or contaminated prior to testing. AE XCVIII at 2–3; Record at 1335–38. This issue is without merit.

### Insanity Defense

■ For his seventh assignment of error,[13] the appellant claims that the record contains clear and convincing evidence that the appellant was not mentally responsible for his actions at the time of the rape. Appellant's Brief at 57. We disagree.

In determining whether the members' findings were correct in fact, we must weigh the evidence and determine for ourselves whether the appellant met his burden of demonstrating by clear and convincing evidence that, at the time of the offense, he lacked mental responsibility. R.C.M. 916(b). In determining whether the members' findings were correct in law, we must view the evidence and all reasonable inferences in the light most favorable to the Government and determine whether a court-martial composed of reasonable members could have found that the appellant failed to prove lack of mental responsibility by clear and convincing evidence. *United States v. Martin,* 56 M.J. 97, 104 (C.A.A.F.2001). "Clear and convincing evidence is that weight of proof which 'produces in the mind of the factfinder a firm belief or conviction that the allegations in question are true.'" *Id.* (quoting CLIFFORD S. FISHMAN, JONES ON EVIDENCE: CIVIL AND CRIMINAL § 3:10 at 239 (7th ed.1992)).

The affirmative defense of lack of mental responsibility requires proof that at the time of the offense, the accused suffered from a "severe mental disease or defect" and as a result, was "unable to appreciate the nature and quality or the wrongfulness of the acts." Art. 50a(a), UCMJ, 10 U.S.C. § 850a(a). The appellant could logically and legally satisfy this test by demonstrating that he lacked mental responsibility over a period of time that includes the time of the rape. The

13. We have considered the appellant's sixth assignment of error, claiming the evidence is factually insufficient because the Government was unable to demonstrate with reliable evidence that the appellant was the rapist. We specifically find beyond a reasonable doubt that the Government's evidence is reliable and is factually sufficient to identify the appellant as the person who committed the charged rape. This assignment of error is without merit.

Government, however, may logically and legally rebut this by demonstrating that the appellant was mentally responsible at the time of the rape. *Martin*, 56 M.J. at 99.

It was undisputed that the appellant, at the time of trial, was diagnosed as suffering from schizophrenia, a severe mental disease or defect under Article 50a(a), UCMJ. There was dispute, however, over when that disorder first presented itself. The defense expert testified that the disorder presented itself prior to the rape, and the Government expert testified that it did not. The defense expert testified that the appellant was suffering from a psychotic episode at the time of the rape and that the appellant could not appreciate the nature and quality or the wrongfulness of his acts during that psychotic episode. The defense expert further stated that a person can demonstrate planned behavior, such as hiding his identity during the crime, during a psychotic episode and still not be able to appreciate the nature and quality or the wrongfulness of the acts. The Government's expert, however, testified that behavior such as wearing gloves, telling the victim not to look at him, covering the victim's head so she could not see him, and perpetrating the crime in the dark of night, all indicated the appellant's awareness of what he was doing and the wrongfulness of those acts. As the Government expert stated: "most human beings do not go to any great length to conceal behavior that they, for whatever reason, don't feel is shameful or wrongful in some fashion. If there's no wrongfulness, why go to the extent of concealing it?" [14] Record at 1255.

Under these circumstances, we conclude there is substantial evidence in the record supporting the members' finding of fact that the appellant did not lack mental responsibility at the time of the rape.[15] Therefore, we hold that a reasonable trier of fact could have found that the appellant failed to prove by clear and convincing evidence his affirmative defense of lack of mental responsibility. We are, ourselves, convinced that the appellant failed to establish the affirmative defense of lack of mental responsibility by a clear and convincing standard. This issue is without merit.

### Post–Trial Delay

For his eighth assignment of error, the appellant claims he is entitled to Article 66(c), UCMJ, sentence relief in the form of disapproving the dishonorable discharge, due to excessive post-trial delay. He points specifically to 608 days that elapsed between the date of sentencing [16] and docketing the case with this court,[17] claiming that: (1) the record was assembled on day 233; (2) the staff judge advocate (SJA) issued his recommendation (SJAR) on day 463; (3) the convening authority (CA) took his action on day 475; and, (4) the case was docketed with this court on day 608. Appellant's Brief at 59. Although the appellant limits his request to Article 66(c), UCMJ, relief, we will also conduct a due process analysis.

We consider four factors in determining if post-trial delay violates the appellant's due process rights: (1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to a timely appeal; and (4) prejudice to the appellant. *United States v. Jones*, 61 M.J. 80, 83 (C.A.A.F.2005)(citing *Toohey v. United States*, 60 M.J. 100, 102 (C.A.A.F.2004)). If the length of the delay is not unreasonable, further inquiry is not necessary. If we conclude that the length of the delay is "facially unreasonable," however, we must still balance the length of the delay against the other three factors. *Id.*

We review four post-trial processing periods for delay. Those include: (1) from

---

14. The victim testified that the rapist wore gloves, told her that he had a knife, not to look at him, covered her head, asked her when her husband was coming home, and tied her up after raping her. Record at 831–38.

15. *See Martin*, 56 M.J. at 107 (adopting a "substantial evidence" standard of review to determine the "reasonableness" of a finding of fact by members on the question of mental responsibility as announced in *United States v. Barton*, 992 F.2d 66, 68 (5th Cir.1993)); and, *United States v. Abou–Kassem*, 78 F.3d 161, 166 (5th Cir.1996).

16. 31 October 2001.

17. 1 July 2003.

date of sentencing to CA's action; (2) from CA's action to docketing with this court; (3) from docketing to final briefing; and, (4) from final briefing to opinion. *See United States v. Moreno*, 63 M.J. 129, 136–37 (C.A.A.F.2006). Here, 475 days elapsed from the date of sentencing until the CA's action. We find that period facially unreasonable, even for a contested general court-martial with members, covering 1,463 pages of record, an additional three volumes of exhibits, and involving 22 pretrial motions. Another 123 days elapsed from the date of the CA's action until docketing with this court. We also find this delay to be facially unreasonable. Another 545 days passed before the appellate defense counsel submitted his final brief, and 156 more days before the Government filed its brief. This case has been in panel for more than one year waiting for a final decision. We find the total delay in this case to be facially unreasonable. We will analyze the delay for a violation of the appellant's due process rights.

1.  Length and reason for delay

■ The SJA explained the delay from date of sentencing to date of SJAR, asserting a reduction in certified personnel to transcribe the record of trial and his personal workload as significant contributors. SJAR of 6 Feb 2003 at 3–6. The CA took his action 12 days later. Our superior court weighs personnel-related causes of delay, during this period, against the Government absent a showing of exceptional circumstances. *Moreno*, 63 M.J. 129, 136. The Government's explanation does not reveal any exceptional circumstances causing this delay. Therefore, this weighs against the Government, as does the 123 days it took the Government to simply get the record of trial to this court. *Id.*, at 136–37. As in *Moreno*, the longest period of delay in this case runs from docketing to final briefing by the parties. Without going into the personnel issues involved, we note that our superior court has held that staffing issues are not held against the appellant, and weighs this against the Government. *Id.*, at 136–37. Nor shall the more than one year it

has taken to issue an opinion in this case be held against the appellant. *Id.*, at 137.

2.  Demand for speedy review

We note that the assistant trial defense counsel correctly anticipated post-trial delay, and sent a demand for speedy post-trial review to the CA several weeks prior to the date the appellant was found guilty. Record at 1150; SJAR at 4. This also weighs against the Government. Even if the appellant had not asserted his right to speedy review, we note that our superior court does not weigh a failure to request speedy review heavily against an appellant. *Moreno*, 63 M.J. 129, 137–138.

3.  Prejudice

The appellant claims he has suffered prejudice, because: (1) he served his confinement sentence before appellant review was completed; and, (2) he was unable to bring his appellate issues before this court in a timely fashion. If we found prejudicial error in the appellant's court-martial, which we do not, the appellant's claim could be sufficient to establish a finding of prejudice under a due process analysis. However, because we do not find prejudicial error, the appellant's claimed prejudice is no more than that suffered by any accused serving a lawful confinement sentence. *Id.*, at 139. Because we conclude that the appellant's assignments of error are without merit, we also conclude that the appellant has not suffered prejudice from not being able to present those issues to this court at an earlier time. Under the totality of these circumstances, we conclude that there has been no due process violation resulting from the post-trial delay.

■ We are also aware of our authority to grant relief under Article 66, UCMJ. *Toohey v. United States*, 60 M.J. 100, 103 (C.A.A.F.2004); *Diaz v. Judge Advocate General of the Navy*, 59 M.J. 34, 37 (C.A.A.F. 2003); *United States v. Tardif*, 57 M.J. 219, 224 (C.A.A.F 2002). Considering the factors we articulated in *United States v. Brown*, 62 M.J. 602 (N.M.Ct.Crim.App.2005)(en banc), we believe the extreme amount of time that the appellant's case has languished in post-

**650**

trial review makes sentencing relief appropriate. We will take action in our decretal paragraph.

### Conclusion

Accordingly, we affirm the findings of guilty and only that portion of the sentence as extends to a bad-conduct discharge and confinement for three years.[18]

Chief Judge ROLPH and Senior Judge SCOVEL concur.

---

**18.** We have considered the appellant's ninth assignment of error claiming that because the death sentence cannot be imposed for the rape of an adult, citing *Coker v. Georgia*, 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977), the statute of limitations for rape is five years, and, therefore, the appellant was brought to trial outside the statute of limitations for rape. We find that there is no statute of limitations for rape based on the plain language of Art. 43(a), UCMJ, 10 U.S.C. § 843(a), and MANUAL FOR COURTS-MARTIAL, UNITED STATES (1998 ed.), Part IV, ¶ 45e(1). *See also Willenbring v. Neurauter*, 48 M.J. 152, 178 (C.A.A.F.1998).