UNITED STATES, Appellee

v.

Ivor G. LUKE, Hospital Corpsman Second Class
U.S. Navy, Appellant

No. 05-0157

Crim. App. No. NMCCA 200000481

United States Court of Appeals for the Armed Forces

Argued October 4, 2010

Decided January 25, 2011

ERDMANN, J., delivered the opinion of the court, in which BAKER, J., joined.  RYAN, J., filed a separate concurring opinion. STUCKY, J., filed a separate opinion concurring in part and dissenting in part.  EFFRON, C.J., filed a separate dissenting opinion.

Counsel

For Appellant:  Lieutenant Michael R. Torrisi, JAGC, USN (argued); Lieutenant Brian D. Korn, JAGC, USN.

For Appellee:  Captain Robert E. Eckert Jr., USMC (argued); Brian K. Keller, Esq.

Military Judge:  Charles A. Porter

**This opinion is subject to revision before final publication.**

United States v. Luke, No. 05-0157/NA

Judge ERDMANN delivered the opinion of the court.

A general court-martial composed of members convicted Hospital Corpsman Second Class Ivor G. Luke, contrary to his pleas, of two specifications of indecent assault upon Seaman Recruit TN in violation of Article 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 934 (2000).[1] Luke was sentenced to confinement for two years and a bad-conduct discharge. The convening authority approved the sentence as adjudged and the United States Navy-Marine Corps Court of Criminal Appeals affirmed the findings and sentence. United States v. Luke, No. NMCCA 200000481, 2004 CCA LEXIS 218, at *16, 2004 WL 2187577, at *6 (N-M. Ct. Crim. App. Sept. 28, 2004).

Upon Luke's appeal to this court in 2005, we initially granted two evidentiary issues and later granted a supplemental issue as to whether Luke's conviction could be affirmed in light of newly discovered evidence.[2] Following two United States v.

---

[1] Prior to trial the Government dismissed with prejudice three specifications of indecent assault and three specifications of indecent language involving other victims. Luke was found not guilty of one specification of sodomy and two specifications of indecent language involving Seaman Recruit TN.

[2] Review was initially granted on the following issues:

    I.    Whether the lower court erred when it upheld the trial judge's exclusion, during cross-examination, of an alleged victim's abortion after it became relevant and material rebuttal to the victim's testimony.

    II.   Whether the lower court erred when it upheld the Government's failure to disclose evidence that it had

United States v. Luke, No. 05-0157/NA

DuBay, 17 C.M.A. 147, 37 C.M.R. 411 (1967), hearings and two

Court of Criminal Appeals decisions, the case is before this

court for the third time.  We now review the following three

issues:  whether newly discovered evidence would probably have

produced a substantially more favorable result; whether the

military judge erred when he held that the Government was not

required to disclose Prosecution Exhibit (PE) 17 to the defense

in pretrial discovery; and whether Luke's due process rights

have been violated by the lengthy post-trial processing of his

appeal.  We hold that the newly discovered evidence would

probably not have produced a substantially more favorable

result; if the military judge erred in holding that the

Government was not required to provide the defense with PE 17 in

pretrial discovery, it was harmless error; and Luke's post-trial

---

     prepared to use on re-direct examination of a
     Government witness.

United States v. Luke, 61 M.J. 278 (C.A.A.F. 2005) (order
granting review).

The supplemental issue was:

    Whether Appellant's conviction can be affirmed by this
    Court in light of the fact that evidence of fraudulent
    testing of DNA has been newly discovered.

United States v. Luke (Luke I), 63 M.J. 60, 61 (C.A.A.F. 2006);
United States v. Luke, 62 M.J. 328 (C.A.A.F. 2005)
(interlocutory order granting motion to file a supplemental
issue).

due process rights were not violated.  We therefore affirm the Navy-Marine Corps Court of Criminal Appeals.

## DISCUSSION

As the three issues before the court present discrete legal and factual matters, we will set forth the facts and procedural background relevant to each in the discussion of the individual issues.

I. <u>Whether the newly discovered evidence of Mills' misconduct renders his conviction unreliable</u>

<u>Factual and Procedural Background</u>:

The situation giving rise to Luke's conviction took place when he was serving as a hospital corpsman aboard the USS Port Royal.  Luke was accused of indecent assault upon a shipmate, Seaman Recruit TN, when she sought a pelvic exam from him after Luke diagnosed her boyfriend, Fireman RA, another shipmate, with a sexually transmitted disease.  Luke contested the charges and maintained that he did not examine TN nor did he commit an indecent assault upon her.  At Luke's court-martial TN and RA both testified to a series of events which supported the indecent assault specifications and which Luke denied.[3]  The defense theory of the case was that TN and RA made up the allegations against Luke in order to avoid the consequences of

---

[3] The underlying facts were detailed in this court's 2006 decision and need not be repeated here.  Luke I, 63 M.J. at 61.

4

the command discovering their romantic relationship, which was in violation of ship policy.

   In addition to testimony from TN and RA, the Government presented testimony from four Naval Criminal Investigative Service (NCIS) investigators and two experts from the United States Army Criminal Investigation Laboratory (USACIL).  The USACIL witnesses testified about serological and DNA testing performed on several items removed from the sleeping quarters of the medical compartment on the USS Port Royal where TN alleged the incident took place, as well as a bra and panties worn by TN during the incident.

   Phillip Mills, then a forensic chemist at USACIL, conducted the serology[4] analysis of the evidence in Luke's case.  Mills examined a bedsheet, a bra, a pair of panties, and a pillowcase for serological evidence.  At Luke's court-martial, Mills testified about stains he found on the sheet and the bra which revealed the presence of amylase and epithelial cells.  Mills did not find any stains of consequence on the pillowcase or the panties.

---

[4] Serology is "the branch of science dealing with the properties, uses, and preparation of serums.  A serum in this sense is a body fluid containing substances useful in the diagnosis, prevention, and treatment of disease."  5 J. E. Schmidt, Attorneys' Dictionary of Medicine and Word Finder S-119 (2010).  As used here, Mills explained that "serology" was the examination of body fluid stains to determine the biochemical makeup of the stain.

Mills testified that amylase is an enzyme that is found in most body fluids in low concentrations but is found in high concentrations in saliva. Epithelial cells are cells forming epithelium, the lining of body cavities and the covering of the skin and mucous membranes. 2 Schmidt, supra note 4, at E-164. Mills explained that epithelial cells are found throughout the body and contain DNA.

Mills testified that the amylase and the epithelial cells on the bedsheet were consistent with saliva and vaginal secretions. The amylase on the bra was found in a high enough concentration that it was "indicative of saliva." Mills further testified that the epithelial cells found on the bra could have come from TN simply wearing the bra. He sent those stains to Marilyn Chase, another USACIL examiner, for DNA analysis.

Chase was qualified as an expert at Luke's court-martial in the forensic application of serological and DNA analysis. She testified about the techniques used to conduct DNA analysis, the quality control procedures in place at USACIL, as well as the peer review process for DNA analysis at USACIL. Chase examined TN's bra, her panties, a cutting from the sheet, and a cutting from a blanket. Chase testified that "[w]hen I analyzed the DNA in the sheet, it was consistent -- or -- with a mixture -- what you see in a mixture of the DNA profiles that were also seen in the blood standards of Luke and [TN]." Regarding the sample

found on the bra worn by TN, Chase testified that her analysis revealed DNA types from at least three people on the bra which were consistent with the DNA profiles of TN, Luke, and RA.[5] Defense counsel questioned Chase about the possibility of contamination of the samples in testing and the possibility of degradation of the specimens. Defense counsel also raised the possibility of exacerbation of degradation of a mixed sample when there are a number of different profiles in a specimen. On redirect examination, trial counsel questioned Chase about the specimens in Luke's case and Chase stated "my controls worked properly in this case. I saw no indication of contamination in any of my reagents or any of the other controls in this case."[6]

The testimony given by Mills and Chase as to the presence of saliva on TN's bra was relied upon by the Government to support TN's account of the incident (that Luke had sucked on her breast during the examination). The Government relied on the DNA on the bedsheet as proof that the encounter took place

---

[5] Chase testified that the DNA analysis on the panties did not reveal DNA profiles of anyone other than TN.

[6] At the first DuBay hearing, when asked whether she could tell whether the evidence provided by Mills had been contaminated, Chase replied, "I couldn't tell if it'd been contaminated when I received the evidence and inventoried it, it didn't look like anything unusual. . . . I couldn't tell unless there was something actually physically wrong."

7

as TN described, contradicting the defense's position that any evidence of saliva and Luke's DNA on the sheet resulted because he had masturbated and then sucked his thumb on the bed that same day. Luke was subsequently found guilty of two specifications of indecent assault in violation of Article 134, UCMJ.

In 2005, six years after Luke's court-martial and one month prior to argument on the two issues originally granted by this court, USACIL issued a memorandum to all staff judge advocates informing them that disciplinary action had been taken against Phillip Mills, the USACIL forensic examiner who had conducted the serological examination in this case. The USACIL memorandum noted that the disciplinary action was taken after it had been discovered that Mills had cross-contaminated and/or switched samples within and between several cases, made a false data entry and altered documentary evidence, falsely stated the results of an examination which he had not performed, and misrepresented work he had performed.

In response to a defense motion, this court granted a supplemental issue addressing the newly discovered evidence of Mills' misconduct and its possible impact on the case. Luke I, 63 M.J. at 61; Luke, 62 M.J. 328. We set aside the decision and ordered further inquiry under DuBay, to determine "whether a Government forensic examiner contaminated Appellant's DNA sample

8

United States v. Luke, No. 05-0157/NA

or otherwise falsified pertinent test results." Luke I, 63 M.J. at 61. A DuBay hearing was subsequently conducted on June 2 and 8, 2006.[7] United States v. Luke, 64 M.J. 193, 194 (C.A.A.F. 2006) (interlocutory order, Appendix A).

Based on testimony and evidence presented at the hearing, the DuBay military judge found that "Mr. [Mills] demonstrated a pattern of mistakes in conducting DNA analysis" but "[n]o evidence was presented that Mr. [Mills] ever altered any results to falsely show the presence or absence of DNA in a sample, or that his failure to follow proper procedures was an attempt to improperly influence or alter the outcome of DNA analysis." Id. at 196. The DuBay military judge found "Mr. [Mills] was proficient in performing serology analysis. He had a full understanding of the standard procedures for conducting serology casework." Id. He also found that Mills only performed the serology portion of the analysis in Luke's case and Chase did the DNA analysis on the samples that Mills prepared. Id. at 196-97. The DuBay military judge found that Mills did not conduct the DNA analysis and therefore never had an opportunity to falsify the results. Id. at 197. He also found that there

---

[7] Following the discovery of Mills' misconduct, the U.S. Army Criminal Investigation Command began a remediation project to review/retest 465 cases on which Mills had worked between 1995 and 2005. This investigation had not been concluded at the time of the first DuBay hearing. The investigation also included two independent DNA investigators who were to review Mills' work and USACIL's procedures.

was no possibility of cross-contamination between the bedsheet and the bra.  Id.

Pursuant to the remand order, the DuBay military judge's findings were returned directly to this court and after further briefing on the supplemental issue, we remanded the case to the Court of Criminal Appeals for further consideration.  United States v. Luke, 65 M.J. 5 (C.A.A.F. 2007) (summary disposition). On May 27, 2008, the Court of Criminal Appeals ordered a second DuBay hearing to determine the status of USACIL's internal investigation and to examine the two independent DNA experts as to the possible impact of Mills' misconduct on Luke's case. United States v. Luke, No. NMCCA 200000481, slip op. at 4 (N-M. Ct. Crim. App. May 27, 2008).  The second DuBay decision reviewed a draft of the USACIL report and noted that the final report was due on September 30, 2008.  The second DuBay military judge concluded that "[n]o prior facts established by the prior Dubay [sic] hearing were modified or altered."

Relying on the DuBay hearings as well as the USACIL final report on Mills' misconduct released on September 30, 2008, the Court of Criminal Appeals issued an opinion affirming the original findings and sentence on July 31, 2009.  United States v. Luke, No. NMCCA 200000481, 2009 CCA LEXIS 270, at *24, 2009 WL 2345124, at *8 (N-M. Ct. Crim. App. July 31, 2009).  The CCA found:

United States v. Luke, No. 05-0157/NA

> The facts elicited both during the USACIL review of Mr. Mills' work and during the DuBay hearings demonstrate that Mr. Mills' DNA analysis while at USACIL suffered from a number of errors. Notwithstanding the seriousness of these errors, as appropriately commented on by the military judge during the second DuBay hearing, there is no evidence that Mr. Mills had any involvement in the appellant's case beyond the serological analysis. . . . [T]he evidence relating to deficiencies in Mr. Mills' DNA analysis would be of limited probative value in assessing the accuracy of his serological examination in the appellant's case and, albeit potential impeachment evidence, would not probably produce a substantially more favorable result for the accused.

Id. at *14-*15, 2009 WL 2345124, at *5 (citation, footnote, and quotation marks omitted).

Analysis:

Rule for Courts-Martial (R.C.M.) 1210(f)(2)[8] sets forth the

---

[8] Article 73 provides that the accused may petition the Judge Advocate General for a new trial on the grounds of newly discovered evidence within two years after the convening authority approves the sentence. Article 73, UCMJ, 10 U.S.C. § 873 (2006). In his separate opinion, Judge Stucky argues that this time limit prohibits this court from exercising jurisdiction as to Issue I. United States v. Luke, __ M.J. __ (5) (C.A.A.F. 2011) (Stucky, J. concurring in part and dissenting in part). Because this issue reached us on direct review under Article 67, UCMJ, 10 U.S.C. § 867 (2006), we disagree. When the evidence of Mills' misconduct was revealed to the defense while Luke's appeal was pending before this court, Luke's appellate defense counsel filed a motion for a supplemental issue specifically noting that the procedure for granting a new trial based on newly discovered evidence "is to petition the Judge Advocate General for a new trial 'within 2 years after approval by the convening authority.'" Luke's appellate counsel explained, "[b]ecause the convening authority approved Appellant's sentence over two years ago, Appellant is seeking relief from this court." Indeed, in Luke I, this court granted the supplemental issue to determine whether the results of Luke's court-martial were reliable in light of newly discovered evidence. 63 M.J. at 61. Therefore this case is not

grounds for granting a new trial based on newly discovered

evidence, specifically:

> (2) <u>Newly discovered evidence</u>. A new trial shall not be granted on the grounds of newly discovered evidence unless the petition shows that:
>
>> (A) The evidence was discovered after the trial;
>>
>> (B) The evidence is not such that it would have been discovered by the petitioner at the time of trial in the exercise of due diligence; and
>>
>> (C) The newly discovered evidence, if considered by a court-martial in the light of all other pertinent evidence, would probably produce a substantially more favorable result for the accused.

"[T]he reviewing court must make a credibility

determination, insofar as it must determine whether the 'newly

discovered evidence, if considered by a court-martial in the

light of all other pertinent evidence, would probably produce a

substantially more favorable result for the accused.'" <u>United

States v. Brooks</u>, 49 M.J. 64, 69 (C.A.A.F. 1998) (citation

omitted). "The reviewing court does not determine whether the

proffered evidence is true; nor does it determine historical

facts. It merely decides if the evidence is sufficiently

believable to make a more favorable result probable." <u>Id.</u>

---

before the court under a petition filed pursuant to Article 73, UCMJ, and as both parties agree that the framework of R.C.M. 1210 should govern our analysis, we proceed under the grant of the supplemental issue in <u>Luke I</u>.

United States v. Luke, No. 05-0157/NA

The parties agree that subsections (A) and (B) of R.C.M. 1210(f)(2) are satisfied but disagree as to subsection (C). Luke argues that the newly discovered evidence of Mills' "misconduct, dishonesty and sloppiness" would probably produce a more favorable result at a new trial. Luke urges this court to set aside the findings and sentence because the newly discovered evidence attacks the reliability of the Government's scientific analysis and raises questions about the "conclusions that formed the bedrock of Appellant's conviction."

The Government counters that the impeachment evidence of Mills' misconduct is not an adequate basis to convene a new court-martial because the new evidence does not refute an essential element of the Government's case. In light of all of the other evidence presented at Luke's court-martial, the Government argues that it is unlikely that impeachment of Mills would result in a more favorable outcome for Luke.

At the first DuBay hearing, six current and former employees of the USACIL testified, including Mills and Chase. The findings of fact and conclusions of law of the military judge following the DuBay hearing contained a number of specific findings as to the procedures Mills followed in conducting the serological examination and included the following:

> 29. Mr. [Mills] demonstrated a pattern of mistakes in conducting DNA analysis, and on at least one occasion, he attempted to cover up his mistake by making a false data entry.

13

30. No evidence was presented that Mr. [Mills] ever altered any results to falsely show the presence or absence of DNA in a sample. Or that this failure to follow proper procedures was an attempt to [im]properly influence or alter the outcome of the DNA analysis in any of the cases.

31. It is evident, however, that Mr. [Mills] had significant problems with the DNA analysis process, which calls into question the forensic reliability of the results of his DNA casework.

32. Mr. [Mills] disciplinary and proficiency problems were all related to his performance of DNA analysis. Mr. [Mills] had never demonstrated a lack of proficiency in any of his other duties.

33. Mr. [Mills] was proficient in performing the serological analysis. . . .

34. In Appellant's case, Mr. [Mills] performed the serology portion, but did not conduct any of the DNA analysis.

35. Mr. [Mills] understood the standard procedure for conducting serology analysis, and followed it in Appellant's case.

        . . . .

43. The presence of Appellant's DNA on the bra can be explained in one of three ways: a) Appellant came into contact with the bra sometime prior to it being collected as evidence; b) the bra became contaminated after it was collected as evidence by coming into contact with Appellant's DNA from another sample; or c) the results were falsified.

44. With respect to Mr. [Mills], he did not conduct the DNA analysis, so he did not have the opportunity to falsify the results. Also, he had no motive to falsify the results, such as the desire to cover up a mistake, as in the documented case. Also, no evidence was presented that Ms. [Chase] or anyone else ever sought to falsify the results.

45. The panties could not have contaminated the bra with Appellant's DNA, because the Appellant's DNA was not present on, the panties.

46. Neither the bed sheet or any other item could have contaminated the bra during the serology portion, because the sample of the bra was cut and sealed in a test tube before the other items were opened.

47. The bra was not contaminated with Appellant's DNA during the serology portion of the forensic analysis, and the results of the DNA analysis were not falsified.

Luke, 64 M.J. at 196-97. Based on the evidence presented at the DuBay hearing, none of these findings could be found to have been clearly erroneous. However, viewed in light of the details which emerged in USACIL's report on Mills' misconduct which was issued two years after the first DuBay hearing, Findings 32 and 33 of the first DuBay military judge, regarding Mills' proficiency in serological analysis, are called into question.

There is support for Luke's argument that, in affirming the DuBay military judge, the CCA overlooked the evidence from the USACIL investigation that Mills was engaged in misconduct during the time period Luke's evidence was examined by USACIL. The primary focus of USACIL's report on Mills' misconduct was his DNA analyses performed between 2000 and 2005 "because of the increased potential for finding case samples still available for retesting" and "[t]his was also the period in which Mr. Mills

15

performed a majority of his DNA casework."[9]  The report did,

however, review Mills' serology work from 1995 through 1999 and

revealed "thoroughness issues" with his serological analyses

during the time period when Luke's sample was analyzed.

Mills conducted serological analyses for thirty-seven Navy

cases between 1995 and 1999.  Of those thirty-seven cases,

investigators found fifteen cases in which a review of Mills'

analysis revealed "thoroughness issues."  The report explained:

> This review identified a lack of thoroughness in the
> work performed by Mr. Mills.  Mr. Mills did not
> examine all the biological swabs and smears submitted
> for examination.  This also resulted in him spending
> less time on examinations.  He was not properly
> screening cases because of his lack of thoroughness
> and the shorter times spent on examinations. . . .
> [H]is screening techniques my [sic] have resulted in
> some questionable negative results in these cases.

Despite these thoroughness issues and the report's conclusion

that Mills' screening techniques may have resulted in some

questionable negative results during this time, the report did

not contain any evidence of contamination or false reporting in

Mills' serological analysis between 1995 and 1999.  Notably, the

report indicated that Mills' thoroughness issues may have

resulted in negative findings where there may have in fact been

forensic evidence present.  "[Mills] had forty-nine negative

---

[9] The report found that the first instance of Mills' DNA false documentation was in 2002, four years after Luke's 1998 court-martial.  The report found no cases with "DNA issues" for the time between 1995 and 1999.

16

cases in the period from 1995-2005. His examination of evidence was incomplete, rushed and not properly screened. Consequently it is doubtful that all forty-nine of these cases were completely negative."

Based on USACIL's final report, the DuBay military judge's determination that Mills was proficient in serological analysis is clearly erroneous. Mills' "thoroughness issues" reflect that he did mishandle evidence when he conducted serological analyses during the period when Luke's evidence was processed by the lab. However, the other findings of the DuBay military judge as to Mills' handling of Luke's sample and the lack of evidence of contamination are not clearly erroneous and are therefore upheld by this court.[10]

Luke argues that the testimony of Chase and Mills was at the core of his conviction because it "assigned instant credibility to [TN]'s story" which was a critical issue in an "otherwise shaky" case. However, while the DNA evidence may have corroborated TN's story, it was not what Military Rule of Evidence (M.R.E.) 608 defines as credibility evidence. See M.R.E. 608(a) ("The credibility of a witness may be attacked or

---

[10] The second DuBay military judge's findings are also clearly erroneous to the extent that he found that no prior fact established by the prior DuBay hearing were modified or altered as a result of the USACIL report.

17

supported by evidence in the form of opinion or reputation. . . .). Luke also alleges that the CCA incorrectly deemed the newly discovered evidence "merely" impeachment evidence. However, using evidence of Mills' lack of thoroughness in his serological examinations and his mishandling of evidence during his DNA examinations to attack his credibility would indeed amount to impeachment evidence. See United States v. Banker, 15 M.J. 207, 210 (C.M.A. 1983) ("Impeachment can be defined as an attack on the credibility or believability of a witness. In general, it is a process of explaining away a witness' testimony as to the existence of a fact at issue in a trial.") (citations omitted). Regardless of how the CCA may have classified the DNA evidence, Luke is correct that Mills' and Chase's testimony supported the Government's theory of the case. However, Luke's argument that TN's "credibility was intertwined with the credibility of the DNA evidence" goes too far. This is not a case where the evidence of newly discovered evidence would have "substantially impeached the prosecutrix' testimony on a material matter." United States v. Williams, 37 M.J. 352, 354 (C.M.A. 1993).

Luke also argues that there probably would be a different result at a new trial because the members would have no confidence that Mills had not contaminated the evidence, or, more broadly, that his misconduct would render him such a completely discredited witness that the members would not

believe him on any issue. While there is no evidence of any
alleged contamination during the serological examination, such
contamination could have only occurred in one of two ways: the
sheet and bra may have been cross-contaminated; or Mills took
blood from Luke's sealed blood sample and contaminated the
evidence during his serological examination. However, the
military judge at the first DuBay hearing found that neither the
bedsheet nor the bra could have been contaminated by other items
because "the sample of the bra was cut and sealed in a test tube
before the other items were opened." Luke, 64 M.J. at 197.
Luke has not established that this finding is clearly erroneous.

As to the possibility that Mills intentionally contaminated
the evidence with Luke's DNA from Luke's blood sample, there is
no evidence from either the DuBay hearing or the USACIL report
that Mills intentionally contaminated a sample in order to
support a prosecution.[11] There is no need to open or examine an
individual's blood sample during a serological examination of
body fluids so the chance of contamination caused by a lack of

---

[11] Luke cites two state cases to support his argument that Mills'
misconduct would completely undermine the validity and
reliability of all of his forensic work. In re Investigation of
the West Virginia State Police Crime Lab., 438 S.E.2d 501 (W.
Va. 1993); State v. Gookins, 637 A.2d 1255 (N.J. 1994). In both
of those cases, however, the analyst/arresting officer
repeatedly falsified data resulting in more convictions. In re
W. Va. State Police Crime Lab., 438 S.E.2d at 503; Gookins, 637
A.2d at 1257. No evidence of falsification of evidence based on
a motive to increase convictions has been established in this
case.

thoroughness is diminished.  Nor is there any evidence that Luke's blood sample was ever examined or opened by Mills during the serological examination.  While it is clear that Mills had "thoroughness" issues, those issues appear to have resulted from sloppiness and undue haste, not intentional contamination.

Luke also analogizes this court's decision in United States v. Webb, 66 M.J. 89 (C.A.A.F. 2008), to Luke's case because "'evidence that the observer, a link in the chain of custody, had been punished for dishonesty' may have raised questions about the integrity of the appellant's urinalysis."  Luke argues that the analysis for Webb and Luke's cases must be the same.  Webb, however, is distinguishable from the instant case.  In Webb, we held merely that a military judge did not abuse her discretion in granting a defense motion for a new trial.  Id. at 93.  We did not hold that a new trial was actually required.  Luke also relies on our case law for the proposition that "[a] petition for a new trial may rest upon newly discovered evidence that would 'substantially impeach[]' critical prosecution evidence 'on a material matter.'"  United States v. Sztuka, 43 M.J. 261, 268 (C.A.A.F. 1995) (quoting Williams, 37 M.J. at 354) (alteration in original).  While evidence of Mills' misconduct would certainly have provided impeachment evidence as to Mills' competence, it was attenuated in time and relevance.  Luke does not dispute Chase's analysis of the DNA on the sheet and TN's

bra but rather argues that evidence of Mills' misconduct in other cases may have created a doubt in the members' minds as to Mills' overall competency or convinced them that he intentionally or negligently contaminated the evidence with Luke's DNA during the serological analysis. As noted, the serological evidence was not the only evidence the Government presented in Luke's case. Seaman Recruit TN and Fireman RA both testified for the Government contrary to Luke's testimony. Our task is to determine "whether the 'newly discovered evidence, if considered by a court-martial in the light of all other pertinent evidence, would probably produce a substantially more favorable result for the accused.'" Brooks, 49 M.J. at 69 (citation omitted).

The newly discovered evidence as it relates to this case goes to the performance of the serology screening and not the DNA tests. Unless Luke can show on appeal a probability of contamination in the serology screening that would account for his DNA being present on the bra and blanket, he is left with the prospect of rebutting compelling DNA statistics[12] based on a defense that his prior masturbation and thumb-sucking resulted in the presence of his DNA in TN's bra. Viewing the entire record of trial, to include the newly discovered evidence, the

---

[12] Dr. Basten testified that it was 290,000 times more likely that the DNA found on the bra was from TN, RA, and Luke than TN, RA, and an unknown contributor.

United States v. Luke, No. 05-0157/NA

DuBay military judge's findings that are supported by the evidence, and the relative weakness of Luke's case,[13] we hold that the newly discovered evidence would probably not have resulted in a substantially more favorable result for Luke.[14]

II. Whether the military judge erred when he found the Government was not required to disclose PE 17 relating to statistical probabilities discussed on redirect examination

Factual and Procedural Background:

Following the testimony of the USACIL witnesses at court-martial, the Government called Dr. Christopher Basten, a research associate statistician from North Carolina State University, to testify as to the probability that Luke's DNA was

---

[13] Luke's defense was that TN and RA fabricated the allegations against him to avoid the consequences of the command discovering their romantic relationship, which was in violation of ship policy.  This theory, however, is undermined by the fact that TN and RA voluntarily informed the command of their relationship when they reported the incident to the command.  Luke also testified that on the date of the alleged events he masturbated on the bed in the hospital quarters using a lubricant called Surgilube and then fell asleep sucking his thumb, thereby accounting for the semen found on the linens and the possibility that Surgilube might be found on a swab NCIS took from his mouth.

[14] In his dissent, the Chief Judge argues Mesarosh v. United States, 352 U.S. 1, 12 (1956), dictates that "[b]ecause 'the original finder of fact' was a court-martial panel, only a new panel 'can determine what it would do on a different body of evidence.'"  United States v. Luke, __ M.J. __ (9) (C.A.A.F. 2011) (Effron, C.J. dissenting).  We are satisfied that the procedures traditionally utilized by this court to review cases presenting newly discovered evidence are appropriate in this case.  See, e.g., Williams, 37 M.J. at 356; United States v. Johnson, 61 M.J. 195, 198 (C.A.A.F. 2005).

contained in the DNA mix found on the bra and the bedsheet versus that of someone else. After being qualified as an expert in statistical genetics, Dr. Basten testified as to the likelihood of Luke being a contributor to the stain on the sheet and bra under several different scenarios. During his testimony Dr. Basten was assisted by a series of demonstrative exhibits that set forth the numerical statistical likelihood that Luke was a contributor under the different assumptions presented to Dr. Basten.[15]

During the cross-examination of Dr. Basten, defense counsel sought to discredit his explanation of the statistical findings and raised the possibility that other unknown contributors' DNA could also be contained in the stain on the bra:

> Q:  But if you weren't taking into account the profiles of the two people -- let's say that they were unknown -- would that affect the way you do the calculations?

> A:  That would affect it if we didn't have any information about the other individuals.

> . . . .

> Q:  Now, whenever there's doubt as to the number of contributors to a mixed sample, there can be

---

[15] Prosecution Exhibits 14, 15, 16, and 18 were handwritten posters similar to PE 17 in format and all displayed the statistical likelihood that Luke and TN were contributors to the stains on the sheet and the bra in various combinations with Fireman RA and other unknown contributors. The record evidence of the exhibits includes the notation "PEs 14-18 . . . used as demonstrative aid only." None of these demonstrative exhibits were offered into evidence.

considerable variation in the likelihood ratio; is that correct?

A:    There will be some variance, yes.

On redirect examination, trial counsel asked Dr. Basten to address the possibility raised by the defense of at least two unknown people contributing to the stains and referred him to PE 17, which had not been used in his direct examination:

Q:    And Doctor, finally, in Prosecution Number 17, this is the possibility that the defense just addressed, two unknowns in the bra.  Can you please explain your findings with respect to two other unknowns in the bra.

A:    So another alternate explanation would be that it was [TN] and two unknown individuals.  And if we compare that to the idea that it was Luke, [TN] and [RA], it's -- the evidence is 51 million times more likely that it's the three of them than [TN] and two unknowns.

Shortly thereafter the defense counsel requested an Article 39(a), UCMJ, 10 U.S.C. § 839(a) (2000), session.  During the Article 39(a), UCMJ, session Luke's attorney complained to the military judge that the basis for the statistical analysis in PE 17 had never been provided to the defense during discovery. Trial counsel responded that Dr. Basten had calculated the figures used in PE 17 "recently."  He argued that it was evidence in rebuttal and they were not required to provide rebuttal evidence in response to pretrial discovery requests. The military judge found that it was clearly rebuttal evidence to which the defense was not entitled during discovery.  Defense

counsel then argued that the probative value of the exhibit was outweighed by its prejudicial effect.  The military judge held the prejudicial impact was minimal, that there was some probative value, and declined to strike the exhibit or provide a limiting instruction.

Before this court Luke argues that the military judge erred when he found that the Government was not required to disclose PE 17 to the defense prior to trial.  He asserts that the defense never opened the door for the admission of this evidence during cross-examination and the admission of this evidence was not harmless because defense counsel was not prepared to properly cross-examine the witness on this point.

In response, the Government argues that trial counsel did not violate discovery obligations because the statistical ratio at issue in PE 17 had been calculated "recently" and the evidence was only presented in response to defense counsel's assertions about two unknown contributors to the DNA profiles on the victim's bra.

Rule for Courts-Martial 701(a)(2) provides:

After service of charges, upon request of the defense, the Government shall permit the defense to inspect:

(A)  Any books, papers, documents, photographs, tangible objects, buildings, or places, or copies of portions thereof, which are within the possession, custody, or control of military authorities, and which are material to the preparation of the defense or are intended for use by the trial counsel as evidence in

> the prosecution case-in-chief at trial, or were obtained from or belong to the accused; and
>
> (B) Any results or reports of physical or mental examinations, and of scientific tests or experiments, or copies thereof, which are within the possession, custody, or control of military authorities, the existence of which is known or by the exercise of due diligence may become known to the trial counsel, and which are material to the preparation of the defense or are intended for use by the trial counsel as evidence in the prosecution case-in-chief at trial.

"The military rules pertaining to discovery focus on equal access to evidence to aid the preparation of the defense and enhance the orderly administration of military justice." United States v. Roberts, 59 M.J. 323, 325 (C.A.A.F. 2004). "To this end, the discovery practice is not focused solely upon evidence known to be admissible at trial. . . . The parties to a court-martial should evaluate pretrial discovery and disclosure issues in light of this liberal mandate." Id. (citation omitted).

Defense counsel's discovery request sought "[a]ny handwritten, computer-generated, typed, or recorded statements by any witness for the government" as well as "[a]ny writing or document, including notes, used by a witness to refresh his/her memory for the purpose of testifying at trial, either while testifying or before testifying." However, it is impossible for this court to address whether there was a discovery violation as the record does not reflect when PE 17 was prepared. We cannot know the meaning of trial counsel's comment that PE 17 had only been produced "recently." The other demonstrative exhibits used

by Dr. Basten (PEs 14, 15, 16, and 18) were used during direct examination and were in the same format as PE 17, which was used in rebuttal.  In addition, comments made by trial counsel during the Article 39(a), UCMJ, session indicated that the Government anticipated that defense counsel would ask the question that he did during cross-examination, and that the Government was prepared to rebut it with PE 17.  If it was prepared pretrial, it should have been provided to the defense in response to their discovery request pursuant to R.C.M. 701(a)(2) regardless of when the Government intended to use it.  United States v. Trimper, 28 M.J. 460, 468 (C.M.A. 1989).  Indeed "[a]n accused's right to discovery is not limited to evidence that would be known to be admissible at trial.  It includes materials that would assist the defense in formulating a defense strategy." Webb, 66 M.J. at 92.  However, if PE 17 was produced mid-trial in response to the cross-examination of Dr. Basten, then the Government could not have provided it to the defense pretrial because it did not exist.

Although we cannot resolve whether a discovery violation occurred, "[a]n appellate court may resolve a discovery issue without determining whether there has been a discovery violation if the court concludes that the alleged error would not have been prejudicial."  United States v. Santos, 59 M.J. 317, 321 (C.A.A.F. 2004).

On direct examination, trial counsel elicited from Dr. Basten a full explanation of the statistics presenting the likelihood that biological evidence in the case linked Luke to the bra. Direct examination of Dr. Basten revealed information about his analysis, including which databases and populations he relied upon to generate the statistics presented. There was no objection during the direct examination of Dr. Basten as to the underlying calculations on the other demonstrative exhibits and apparently the statistical basis for those exhibits was no surprise to the defense. There is no indication that Dr. Basten relied on a separate database or population for the calculations in PE 17. It was simply a piece of demonstrative evidence that did no more than reiterate the expert's testimony on direct examination. The defense therefore had all of the information necessary to understand how the calculations in PE 17 and the other demonstrative exhibits were derived. Further, given the multiple statistical formulations presented on direct examination, we cannot find that one additional calculation of the odds that the physical evidence was attributable to Luke tipped the scales against Luke in this case. Therefore, we find that the admission of PE 17 was not prejudicial.

III. <u>Whether Luke's due process rights were violated by untimely post-trial proceedings</u>

The Court of Criminal Appeals reviewed Luke's claim that he was denied speedy post-trial processing of his case. <u>Luke</u>, 2009 CCA LEXIS 270, at *21, 2009 WL 2345124, at *6. That court found that any due process violation that may have occurred in Luke's case was harmless beyond a reasonable doubt. <u>Id.</u> at *22, 2009 WL 2345124, at *7.

Before this court Luke renews his argument that the eleven-year delay between his conviction and the lower court decision was unreasonable and is attributable to the Government. Luke cites the numerous motions for enlargement of time made by both his defense attorney and the Government before the lower court and also faults the Government for the delayed investigation into Mills' misconduct. Luke claims he was prejudiced by the post-trial delay because the Government destroyed the physical evidence, making any review of the biological evidence impossible, and because the United States has denied his application for citizenship because of his court-martial conviction.

The Government cites the lengthy, in-depth investigation into Mills' misconduct that was required to properly evaluate all the cases Mills handled as reason for the post-trial delay. Given these extraordinary circumstances, the Government argues that the post-trial delay in Luke's case was reasonable.

29

Further, the Government asserts that Luke's arguments that he suffered prejudice are weak and he has not presented any concrete evidence as to why his application for citizenship was denied.

This court's methodology for reviewing issues of post-trial and appellate delay was set out in United States v. Moreno, 63 M.J. 129 (C.A.A.F. 2006). We first determine whether the delay is facially unreasonable and, if so, we examine the four factors set forth by the Supreme Court in Barker v. Wingo, 407 U.S. 514, 530 (1972). United States v. Young, 64 M.J. 404, 408-09 (C.A.A.F. 2007). The four factors are: (1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice. Id. If this analysis leads us to conclude that the appellant has been denied the due process right to speedy post-trial review and appeal, we grant relief unless we are convinced beyond a reasonable doubt that the constitutional error is harmless. Id. at 409 (citation omitted). "Issues of due process and whether constitutional error is harmless beyond a reasonable doubt are reviewed de novo." Id. (citation omitted).

With a delay of over eleven years between the completion of his court-martial and the issuance of the Court of Criminal Appeals decision, there is no doubt that the length of delay is facially unreasonable. However, we need not engage in a

United States v. Luke, No. 05-0157/NA

separate analysis of each factor where we can assume error and proceed directly to the conclusion that any error was harmless beyond a reasonable doubt. Id. Reviewing the totality of circumstances in this case,[16] including the fact that we have found no merit in either of substantive issues appealed by Luke, we conclude that any denial of his right to speedy post-trial review and appeal was harmless beyond a reasonable doubt.[17] See id.; United States v. Bush, 68 M.J. 96, 104 (C.A.A.F. 2009) (holding denial of right to speedy post-trial review harmless beyond a reasonable doubt).

## DECISION

The decision of the United States Navy-Marine Corps Court of Criminal Appeals is affirmed.

---

[16] We acknowledge that the delay in this case was extreme and take particular note of the second DuBay military judge's conclusion regarding the speed of the Government's review:

> There appeared to be no sense of urgency on the part of the USACIL laboratory administration or their chain of command to resolve the weighty issues associated with the substantial allegations pending against them. While I do not consider the investigation of Mr. Mills and the subsequent analysis the model of dispatch, it does appear to be thorough.

However, the majority of the delay was attributable to the procedural back and forth among this court, the Court of Criminal Appeals, and the DuBay proceedings.

[17] We also note that there is no evidence in the record to support Luke's contention that his application for citizenship was denied.

31

United States v. Luke, No. 05-0157/NA

RYAN, Judge (concurring):

Appellant successfully petitioned this Court to grant his supplemental issue pursuant to Article 67, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 867 (2006), United States v. Luke, __ M.J. __ (2) (C.A.A.F. 2011). Nonetheless, with respect to the supplemental issue, I view his claim as a petition for a new trial on the basis of newly discovered evidence, governed by Article 73, UCMJ, 10 U.S.C. § 873 (2006), and Rule for Courts-Martial (R.C.M.) 1210. Indeed, Appellant has consistently invoked the statutory language of Article 73, UCMJ, and R.C.M. 1210, and the Court's opinion makes clear that "the framework of R.C.M. 1210 should govern our analysis." Luke, __ M.J. __ (12 n.8).

I concur in and join the opinion of the Court. I write separately because as a matter of first impression I would have found Appellant's petition for a new trial based on newly discovered evidence to be time-barred. Both Article 73, UCMJ, and R.C.M. 1210(a) set forth a clear time limit for petitioning for a new trial: "2 years after approval by the convening authority of a court-martial sentence." This is so even if the petitioner did not discover the evidence until after the two-year time period has expired. See, e.g., United States v. Rashid, 375 F.

App'x 199, 201 (3d Cir. 2010) (holding that a motion for a new trial based on newly discovered evidence under Fed. R. Crim. P. 33 was untimely when made outside the three-year filing period and based on evidence discovered outside that three-year filing period).

But when this Court considered the timeliness of Appellant's request, it ordered the CCA to conduct a DuBay hearing in order to determine whether Appellant was entitled to a new trial. United States v. Luke (Luke I), 63 M.J. 60, 63 (C.A.A.F. 2006). The Government has not appealed this decision. Therefore, although I agree with the reasoning of the dissent in Luke I, see id. at 64 (Erdmann, J., dissenting), and am prepared to revisit the issue in an appropriate case, I regard the decision in Luke I as law of the case here. See United States v. Erickson, 65 M.J. 221, 224 n.1 (C.A.A.F. 2007) (holding that when a ruling is not appealed, it "will normally be regarded as law of the case and binding upon the parties").[1]

---

[1] While a jurisdictional error may not be waived, the filing time limit set forth in Article 73, UCMJ, and R.C.M. 1210 is more akin to a statute of limitations. See John R. Sands & Gravel Co. v. United States, 552 U.S. 130, 133 (2008) (noting that whereas some time limits are jurisdictional, "[m]ost statutes of limitations" are not). Whereas United States v. Rodriguez, 67 M.J. 110 (C.A.A.F. 2009), and Bowles v. Russell, 551 U.S. 205 (2007), considered statutory language governing when courts are permitted to take appeals, see Article 67(b), UCMJ; 28

---

U.S.C. § 2107(a), the language at issue here in Article 73, UCMJ, and R.C.M. 1210, like the language of Fed. R. Crim. P. 33, governs when a petitioner has the right to file. Accord Eberhart v. United States, 546 U.S. 12, 19 (2005) ("[I]t is difficult to escape the conclusion that [time limits for Fed. R. Crim. P.] 33 motions are . . . nonjurisdictional" (citing Kontrick v. Ryan, 540 U.S. 443 (2004))).

United States v. Luke, No. 05-0157/NA

        STUCKY, Judge (concurring in part and dissenting in part):

        Because I believe that under recent precedents we have no
jurisdiction to entertain Appellant's request for a new trial, I
would vacate the grant of review on Issue I and dismiss the
petition with respect to that issue.  I concur in the majority's
disposition of Issues II and III.

                                I.

        The convening authority acted on Appellant's case on March
29, 2000.  More than five years later, on August 31, 2005, after
this Court had already granted review of two issues, Appellant
submitted a motion to file a supplemental issue -- asking for a
new trial -- directly to this Court.  We granted review of the
supplemental issue and remanded for an evidentiary hearing into
whether the evidence supporting his conviction had been
compromised or falsified.  See United States v. Luke (Luke I),
63 M.J. 60, 63 (C.A.A.F. 2006).

        The Government, relying on our decision in United States v.
Rodriguez, 67 M.J. 110 (C.A.A.F. 2009), now argues in its brief
that we do not have jurisdiction to consider whether to grant a
new trial in this case.[1]  While Appellant insists that our

_____

[1] In light of our opinion in Rodriguez, the Government raised the
jurisdictional issue before the United States Navy-Marine Corps
Court of Criminal Appeals (CCA), but the CCA correctly noted
that it was "constrained to exercise jurisdiction to consider
the appellant's petition by the remand of our superior court."
United States v. Luke, No. NMCCA 200000481, 2009 CCA LEXIS 270,

United States v. Luke, No. 05-0157/NA

assertion of jurisdiction in Luke I is controlling, and points

to the 2009 opinion of the court below as support for the

proposition, neither is convincing.  See United States v. Luke,

No. NMCCA 200000481, 2009 CCA LEXIS 270, 2009 WL 2345124 (N-M.

Ct. Crim. App. July 31, 2009).  The decision of a lower court

cannot, of course, control our independent assessment of our own

jurisdiction, an assessment we are required to make.  Mansfield,

Coldwater & Lake Michigan Ry. Co. v. Swan, 111 U.S. 379, 382

(1884).

    In Rodriguez, decided after Luke I, a majority of this

Court held that the petition-filing deadline in Article 67(b),

Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 867(b)

(2006), "is jurisdictional and mandatory" in light of the

Supreme Court's decision in Bowles v. Russell, 551 U.S. 205

(2007).  67 M.J. at 116.  Bowles held generally that statutory

time limits on filings were jurisdictional:

> Because Congress decides whether federal courts can
> hear cases at all, it can also determine when, and
> under what conditions, federal courts can hear them.
> Put another way, the notion of "subject-matter"
> jurisdiction obviously extends to "classes of
> cases . . . falling within a court's adjudicatory
> authority," but it is no less "jurisdictional" when
> Congress prohibits federal courts from adjudicating an
> otherwise legitimate "class of cases" after a certain
> period has elapsed from final judgment.

---

at *11, 2009 WL 2345124, at *4 (N-M. Ct. Crim. App. July 31,
2009) (unpublished).

2

United States v. Luke, No. 05-0157/NA

551 U.S. at 212-13 (ellipsis in original) (citations and quote marks omitted).

"Federal courts, including courts in the military justice system established under Article I of the Constitution, are courts of limited jurisdiction." United States v. Wuterich, 67 M.J. 63, 70 (C.A.A.F. 2008). "Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." Ex parte McCardle, 74 U.S. (7 Wall.) 506, 514 (1868), quoted in Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94 (1998).

The exercise of jurisdiction at one stage of a case does not guarantee its continuance. Nor does it mean that we, as a court of limited and purely statutory jurisdiction, may ignore intervening events that affect that jurisdiction, whether federal statutes or Supreme Court decisions. See McCardle, 74 U.S. (7 Wall.) at 514 (holding that Congress may, by statute, divest the Supreme Court of appellate jurisdiction in a case already before it).

II.

Article 73, UCMJ, 10 U.S.C. § 873 (2006), provides:

At any time within two years after approval by the convening authority of a court-martial sentence, the accused may petition the Judge Advocate General for a

3

new trial on the grounds of newly discovered evidence or fraud on the court. If the accused's case is pending before a Court of Criminal Appeals or before the Court of Appeals for the Armed Forces, the Judge Advocate General shall refer the petition to the appropriate court for action. Otherwise the Judge Advocate General shall act upon the petition.

This statute contains precisely the same sort of limit on a particular filing as the Title 28 statutory provisions examined in Bowles and Article 67(b) as construed in Rodriguez. Although the two-year time limit in Article 73 is not expressed in a statute from which this Court's jurisdiction is derived -- Article 67 -- "[t]he accepted fact is that some time limits are jurisdictional even though expressed in a separate statutory section from jurisdictional grants." Barnhart v. Peabody Coal Co., 537 U.S. 149, 159 n.6 (2003), quoted in Bowles, 551 U.S. at 210. Article 73 is such a statute.

Under the logic of Rodriguez, I believe that we cannot exercise jurisdiction over the request for a new trial, which was made long after the expiration of the two-year period prescribed in Article 73. Accordingly, I would vacate the grant of review on Issue I and dismiss it for lack of jurisdiction.

### III.

The majority insists that it is not reviewing a petition for new trial under Article 73, but merely a "supplemental issue" raised by Appellant "to determine whether the results of Luke's court-martial were reliable in light of newly discovered

4

evidence." United States v. Luke, __ M.J. __ (11 n.8) (C.A.A.F. 2011). But as the author of today's majority opinion noted in his dissent in Luke I, considering the supplemental issue outside the statutory scheme set forth in Article 73 represents "a broad extension of the right to a new trial based on newly discovered evidence" that is not supported by our jurisprudence. See 63 M.J. at 64 (Erdmann, J., dissenting).

"Petitions for new trials are disfavored in the law . . . ." United States v. Harris, 61 M.J. 391, 394 (C.A.A.F. 2005). Congress established strict ground rules concerning petitions for new trial; they must be filed with the Judge Advocate General within two years of the convening authority's approval of the sentence, and only on the grounds of newly discovered evidence or fraud on the court. Article 73, UCMJ. Such petitions are only referred to a military appellate court if the case is pending at the court when the petition is filed with the Judge Advocate General. Had Appellant filed a petition with the Judge Advocate General, it would have been denied as untimely and would not have been referred to this Court.

To escape the inevitable denial of his petition for new trial as being untimely filed, Appellant successfully circumvented the procedures established by Congress for petitions for new trials by calling this a supplemental issue.

The majority opinion tries to distinguish between the two but then resolves the issue by employing the framework of Rule for Court-Martial (R.C.M.) 1210(f)(2), which "sets forth the grounds for granting a new trial based on newly discovered evidence." Luke, __ M.J. at __ (11-12).  But calling it a supplemental issue, rather than a petition for new trial, doesn't make it so. If it looks like a petition for new trial and the Court employs the President's framework for reviewing petitions for new trial, it probably is a petition for new trial.

By judicial fiat, we have enlarged our jurisdiction to permit any accused to file a petition for new trial directly to this Court while the case is on direct appeal.  If Congress had meant that result, it would have said so in Article 67 or Article 73.

In her concurring opinion, Judge Ryan states that "the filing time limit set forth in Article 73 and R.C.M. 1210 is more akin to a statute of limitations" than a jurisdictional filing deadline, and governs when a petitioner has a right to file rather than when courts are permitted to take appeals. United States v. Luke, __ M.J. __ (2 n.1) (Ryan, J., concurring) (citing Eberhart v. United States, 546 U.S. 12, 19 (2005); Kontrick v. Ryan, 540 U.S. 443 (2004)).  I disagree.  Unlike the claims-processing rules in Eberhart (Fed. R. Crim. P. 33) and Kontrick (Fed. R. Bank. P. 4004, 9006), Article 73 is a

statutory limitation much like those in Bowles and Rodriguez,

which were determined to be jurisdictional.

United States v. Luke, No. 05-0157/NA

    EFFRON, Chief Judge (dissenting):

    Post-trial information concerning an expert forensic witness for the prosecution at Appellant's court-martial revealed that the expert had been suspended from his Government position as a forensic examiner.  This suspension, which ultimately led to the expert's resignation, resulted from a Government investigation conducted several years after Appellant's trial that demonstrated misconduct and deficiencies in the performance of his forensic duties sufficient to warrant disciplinary action.  The case before us addresses the impact of the post-trial information on the validity of Appellant's conviction.

1.   Background

    The Navy charged Appellant, a hospital corpsman, with indecent assault of a patient, Seaman Recruit TN.  The parties agreed at trial as to the underlying circumstances leading up to the charged offense.  In the course of his duties, Appellant had examined Fireman A, who was involved in a sexual relationship with Seaman Recruit TN, to address the possibility that Fireman A was afflicted with a sexually transmitted disease.  The sexual relationship between Seaman Recruit TN and Fireman A violated a shipboard order prohibiting dating among shipmates.  Following the examination of Fireman A, Seaman Recruit TN visited the medical facility as well.

2.  The testimony of the complainant and Appellant

The parties at trial offered substantially different versions as to what happened next.  Seaman Recruit TN testified that Appellant examined her to determine whether she had a sexually transmitted disease, and sexually assaulted her during the course of the examination.  Appellant, who denied the allegation, testified that Seaman Recruit TN visited the medical spaces after his examination of Fireman A.  He stated that she was upset and agitated, and soon left the area.  He also stated that he did not conduct a medical examination of Seaman Recruit TN and did not otherwise touch her in an inappropriate manner.

3.  The opposing theories of the case

At trial, the two parties presented diametrically opposed theories of the case.  According to the prosecution, Appellant took advantage of Seaman Recruit TN's vulnerability and manipulated the circumstances to transform a medical examination into an opportunity for sexual gratification.  According to the defense, Seaman Recruit TN and her boyfriend, Fireman A, feared that Appellant would disclose their prohibited relationship, and concocted the charges to divert attention from their own misconduct.

4.  Expert testimony

The case did not involve any third party eyewitnesses to the charged misconduct.  Each party presented circumstantial

evidence supporting that party's theory of the case, as well as circumstantial evidence countering the theory of the opposing party.

The prosecution offered expert testimony from two Government employees on the results of DNA testing of both bedding from the medical compartment and undergarments identified by Seaman Recruit TN as those worn by her at the time of the charged incident. Phillip Mills, a forensic chemist at the United States Army Criminal Investigative Laboratory (USACIL), testified about his serology examination of the bedding and articles of clothing. His testimony described his handling of the physical evidence, the nature of the tests he performed, and his identification of stains indicating the presence of bodily fluids.

Mills testified that he transmitted the stains to another USACIL employee, Marilyn Chase, for DNA analysis. Chase testified about her DNA examination, and expressed her conclusion that the testing indicated that the stains transmitted by Mills showed the presence of DNA consistent with that of Appellant's DNA.

5.  The court-martial findings and initial review

The court-martial found Appellant guilty of the charged indecent assaults. On February 22, 1999, the court-martial

adjudged a sentence that included confinement for two years and a bad-conduct discharge.

The case was docketed at the Navy-Marine Corps Court of Criminal Appeals on May 8, 2000. The Court of Criminal Appeals completed its review on September 28, 2004, at which time it affirmed the findings and sentence.

6. Forensic misconduct

Appellant subsequently filed an appeal with our Court. While that appeal was pending, USACIL issued a memorandum on August 25, 2005, alerting all staff judge advocates that a USACIL DNA examiner had been suspended "after permitting contamination in his testing process."

In a subsequent memorandum, issued on October 17, 2005, USACIL identified the examiner as Phillip Mills, and listed a number of problems with his work, including incidents in which he "cross-contaminated and/or switched samples," "altered documentary evidence," "entered false data regarding a control sample," "admitted to making a false data entry and creating a false document," and "misrepresented he examined evidence when he had not." The reliability of the trial results in Appellant's court-martial, in light of the information about Mills, has been addressed in subsequent factfinding and appellate proceedings. See United States v. Luke, 63 M.J. 60, 63 (C.A.A.F. 2006); United States v. Luke, 65 M.J. 5 (C.A.A.F.

4

United States v. Luke, No. 05-0157/NA

2007); United States v. Luke, No. NMCCA 200000481, 2009 CCA
LEXIS 270, 2009 WL 2345124 (N-M. Ct. Crim. App. July 31, 2009)
(unpublished).

Following discovery of the deficiencies in the testing
process due to Mills's misconduct, USACIL asked law enforcement
agencies to return the physical evidence in the cases he had
handled so that USACIL could conduct new testing.  The Naval
Criminal Investigative Service reported that it had destroyed
the evidence in Appellant's case prior to receiving the request
from USACIL.  As a result, the physical evidence relied upon by
the court-martial to convict Appellant was not available for
retesting during the subsequent factfinding proceedings.

The evidence received in the factfinding proceedings
confirmed information about Mills's misconduct as a forensic
examiner.  The evidence confirmed that Mills, among other
things, allowed "samples to contaminate one another," "did not
follow proper testing procedures," on at least one occasion
"attempted to cover up his mistake by making a false data
entry," and "had significant problems with the DNA analysis
process, which calls into question the forensic reliability of
the results of his DNA casework."  The evidence also
demonstrated that contamination of the physical evidence could
occur during the serology portion of the testing, thereby
undermining the validity of the subsequent DNA testing.

The factfinding hearings identified the period of Mills's most serious misconduct as taking place while he was a DNA examiner, a period that occurred several years after his work in Appellant's case as a serology examiner.  In that light, and in view of the testimony about the physical evidence, testing process, and lack of motive for falsification, the military judge conducting the factfinding hearing concluded that there had been no contamination or false testimony with respect to Appellant's DNA.  The military judge noted, however, that the physical evidence had been destroyed, and that contamination can occur during the serology portion of the testing process.

7.   Discussion

The majority affirms the findings of the court-martial, relying on the standard set forth in United States v. Brooks, 49 M.J. 64, 69 (C.A.A.F. 1998) (requiring an evaluation of "whether the newly discovered evidence, if considered by a court-martial in light of all other pertinent evidence, would probably produce a substantially more favorable result for the accused") (citation and quotation marks omitted).  If Brooks provided the sole governing principle, I would agree with the majority.  In the present case, however, we must also take into consideration Mesarosh v. United States, 352 U.S. 1 (1956), which applies when post-trial information so discredits the credibility of a

6

principal government witness that it undermines the integrity of the judicial process.

The Supreme Court distinguished the circumstances in Mesarosh from the normal treatment of a new trial request involving newly discovered evidence.  Id. at 9.  In Mesarosh, the government identified information that impugned the credibility of a witness in unrelated proceedings.  The Supreme Court concluded that in such a case the credibility of important government witnesses implicates the "integrity of . . . criminal trial[s] in the federal courts," and held that the "dignity of the United States Government will not permit the conviction of any person on tainted testimony."  Id. at 3, 9.

During the proceedings before the Supreme Court in Mesarosh, the government had suggested that the case should be returned to the district court to assess whether the newly discovered evidence in fact warranted a new trial.  Id. at 8-9. The Supreme Court rejected that approach, and instead set aside the conviction.  Id. at 9, 14.  The Court concluded that because "the original finder of fact was a jury," only a "jury can determine what it would do on a different body of evidence." Id. at 12.  The principles promulgated by the Court in Mesarosh have since been utilized in similar situations by other federal courts.  See, e.g., Williams v. United States, 500 F.2d 105 (9th

Cir. 1974); United States v. Polisi, 416 F.2d 573 (2d Cir. 1969).

In the case before us, Mills -- a Government employee -- was interjected into the case by the Government to participate in its investigation.  He played a vital role in the examination of Appellant's forensic evidence.  Mills was the first USACIL examiner to come into contact with the evidence at issue, and he repeatedly interacted with the evidence during the course of his serological examination.  Specifically, Mills removed the evidence for examination, visually inspected it for stains, cut out the areas of suspected stain with scissors, placed these materials in sterile test tubes for storage, and forwarded these tubes to Chase for DNA analysis.

The Government's investigation established Mills's history of cross-contamination, violation of laboratory protocols, "incomplete and incompetent" analysis as a DNA examiner, and "thoroughness issues" as a serology examiner, all of which underscore the potential for contamination of Appellant's evidence in the present case.  The Government subsequently destroyed the physical evidence at issue, thereby precluding the type of retesting that might have restored some level of confidence in the process.  In this context, the evidence of Mills's misconduct undermines the integrity of Appellant's verdict.  Because "the original finder of fact" was a court-

martial panel, only a new panel "can determine what it would do on a different body of evidence." Mesarosh, 352 U.S. at 12. Accordingly, I respectfully dissent from the majority's decision to affirm the findings and sentence.